E. V. Sparhawk & Others *v.* The Administrator of Ozias Chittenden, January, 1837. Buell & Others.

## (In Chancery.)

In petitions for rehearing in Chancery, the whole case is open to both parties.

A bequest of " one thousand dollars to *the children* of ———," creates an estate or interest, in joint tenancy, with the *jus accrescendi*, and where some of the legatees decease, after the death of the testator, before the recovery of the legacy, the interest vests in the survivors.

One executor is not liable for the *devastavit* of another joint executor, where he never had the control or possession of the funds.

But if both take possession of the goods jointly, or if one, having possession of the goods, suffer them to go into the hands of another executor, who squanders them, both are liable for the waste.

If executors give a joint bond for faithful administration, each is liable for the acts of the others. The statute in force, in the compilation of Tolman's edition of the statutes, requires executors to give a bond for faithful administration; *"in the same manner* administrators were by law required to do," and, under such statute, an executor's bond, providing that the executors shall pay all legacies, is a valid and binding obligation, as coming within the fair intent and meaning of the statute.

The appropriate remedy, for the recovery of a legacy of the executor, by the legatee, is in Chancery.

Such claim is not within any of the statutes of limitation, nor does any presumption of payment, in such case, arise in less time than twenty years, unless corroborated by proof of other circumstances.

Such claim is not barred by not being presented to the commissioners of insolvency, on the estate of the executor, but may still be pursued in Chancery.

A decree of this Court, made to depend upon the performance of a condition *precedent*, is of no force whatever, until such condition is complied with. If an authority be conferred upon condition of the appointee giving security for the faithful discharge of the office, the giving of the security is a condition precedent to the vesting of the authority.

The decrees of probate Courts, within their appropriate jurisdiction, and when the subject matter of the adjudication is sufficiently expressed, will be presumed to have been made upon other sufficient previous proceedings, unless the contrary appear from the records themselves.

The decrees of probate Courts are as conclusive as the orders, sentences, or decrees of any other Court, within their proper sphere of jurisdiction.

But the proceedings of these Courts being in the nature of proceedings *in rem*, they are only conclusive upon matters directly adjudicated, and not

Chittenden,
January,
1837.

Sparhawk &
Others
*v.*
Admr. of
Ozias Buell
and Others.

upon matters collaterally recited. The decree is conclusive for the purpose for which it was made, and no further. In the settlement of an administrator's or executor's account, the decree is conclusive, as to the proper distribution of the estate, but if debts or legacies be credited the executor or administrator, as so much money paid, the creditors or legatees are not thereby concluded. But should the residuary legatee question his right to pay such debt or legacy, the decree will be conclusive.

The age of majority of females, in this State, is fixed by the constitution at eighteen years.

A receipt, not under seal, acknowledging to have received full payment of a debt or legacy, is *prima facie* a bar to the recovery of such debt and may be relied upon as evidence of payment.

But it is competent to give parol evidence to contradict such receipt, and, if it be proved to have been given without consideration, it is of no force, as a defence to the suit.

If one of two or more defendants in Chancery suffer the bill to be taken as confessed, and other defendants answer, and testimony is taken, the wife of the defendant, *defaulted,* cannot testify, on the part of the orators, against the other defendants, on the ground that her testimony tends to charge her husband; for if no decree passes against the defendants answering, none can be had against the defendant, against whom the bill is taken as confessed.

If Chancery have appropriate jurisdiction of the subject matter of the bill, and a defendant be joined, who is ultimately liable for the amount, for which the orator is entitled to a decree, the Court will retain the bill, and pass a decree against the defendant ultimately liable.

An executor is not liable to pay interest on a legacy, due to infant legatees, and no time of payment specified, until guardians are appointed, and the executor is notified of such appointment, unless he has actually received interest on the money, or the money was so invested that he might have received interest without incurring an unreasonable hazard.

The bill in this case states, that on the 29th day of June, 1814, William C. Harrington, of Burlington, made and published his last will and testament, by which he bequeathed to the "children of Phineas Lyman," one thousand dollars, and appointed Lyman King, Ozias Buell, Phineas Lyman, and Isaac R. Harrington, the executors of his will; that the testator deceased, and the executors above named, on the 18th July, 1814, duly proved the will and jointly assumed the trust thereby imposed, and possessed themselves of the testator's personal and real estate to the amount of sixty thousand dollars.

The names of the legatees are Julia B., the wife of Edward V. Sparhawk, Charles Y. Lyman, Mary Jane Lyman, and Sarah M. Lyman, being the orators.

The bill further states, that while the legatees were all minors, under the age of twenty-one years, and when the said Julia B. was of about the age of twenty years, and the said Sarah M. of the age of eighteen years, being in the year 1823, Buell and Phineas Lyman procured the two last named legatees to sign a writing, without knowing its contents, which purported to be a discharge of their portion of said legacy; and that the writing was obtained without any consideration, and by fraud.

The bill further states, that since the legatees have arrived at full age, they have demanded payment of said legacy of the executors. Bill dated 12th Dec., 1832, and praying a decree of the Court, that the defendants pay the several sums due the legatees.

The bill was taken as confessed against Phineas Lyman and also against Lyman King. Isaac R. Harrington, being out of the State, was not served with process.

Frederick Buell, administrator of Ozias Buell, made answer on the part of his intestate, first insisting that the claim was barred by not having been presented to the commissioners on the estate of said Ozias, which closed on the 18th day of February, 1833, and after all the heirs had come of full age.

The answer admits the bequest, in the manner set forth in the bill, and that the orators are the legatees, as described in the bill; that the defendants were named executors of the will, and proved the same, and took upon themselves the burden of the trust thus imposed. It admits that the testator, William C. Harrington, left a large personal and real estate, and that the executors possessed themselves thereof, severally, and not jointly.

The answer alleges that there was a large debt, exceeding two thousand dollars, due to Phineas Lyman, as allowed by commissioners appointed on said estate, and that he, without the concurrence of the other executors, possessed himself of a large amount of debts, due the estate, and retained in his own hands the amount of said legacy, as, in the capacity of natural guardian of said legatees, he lawfully might do, or else, that he paid said legacies to said legatees, in food, clothing, and education.

The answer further states, that on the 3d day of October, 1822, the executors, being about to make a second account of their proceedings to the probate Court, were, by said Court, required to render a joint account, and that in rendering said account, they credited themselves with the payment of said

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

Chittenden,
January,
1837.

Sparhawk &
Others.
*v.*
Admr. of
Ozias Buell
and Others.

legacy and interest, amounting to $1207, which said pay-
ment, so made by said Lyman, and credited by said executors,
was by said Court *adjudged* a good and valid payment of said
legacy, and that by said settlement, there was found due from
said executors, or in their hands, the sum of $8281,27, which
was by said Court decreed to be paid to the residuary legatees,
which was done before the 18th day of March, 1823, and that
on that day the probate Court decreed a perpetual *quietus*.

The answer further alleges, that said Phineas is now wholly
insolvent, and that there being many of the legatees of said
estate, other than these orators, who were infants at the time of
the settlement of the estate, the executors petitioned this Court,
at their Dec. Term, A. D. 1817, for leave to pay the amount
of such legacies to the parents of such children respectively, and
said Phineas Lyman being permitted by said Court to appear
on the part of his said children, and requesting such decree
as was prayed for, the same was by said Court made, and that
on payment of such legacies to the parents of the legatees re-
spectively, the executors should thereafter be forever acquit and
discharged, the parents being by said decree required to give
bonds to Ozias Buell, trustee for that purpose, for the faithful dis-
charge of their duty in that behalf. The answer further alleges,
that the said Phineas had, at the time of this decree, money
to the full amount of such legacy due his children, over and
above the debt due him from said estate, and further, that he
neglected to furnish any such security, as by the conditions of
said decree of this Court required, insisting upon his right to re-
tain the money, and expend it in the education and support of his
children, and as this defendant had not the power, either to com-
pel the giving of the security, or the surrender of the funds, he
ought to be held not liable.

The answer further alleges that said Phineas, being at the
time of the decease of the testator, and ever since, poor and in
such destitute circumstances, as to be unable to maintain his said
children in a manner suitable to their degree, he expended the
full amount of their respective shares, in the prudent and proper
education of the several legatees; that Sarah and Julia, both be-
fore, and for a long time after they had arrived at the age of
eighteen years, were well knowing that said Phineas was ex-
pending their respective shares of said legacy in their education,

beyond his own proper means, and never at any time dissented
therefrom.

The answer further insists, that said Julia was born in the month
of November, 1802, and Sarah, in October, 1804, and so became of full age, being more than eighteen years of age before the first day of February, 1823, and that on that day, in consideration of having virtually received their respective shares in said legacy, in the manner above stated, they executed a writing under their hands, acknowledging to have received six hundred dollars in full of such legacy, and admits that nothing was paid them *at the time* of executing the writing, but denies *all* fraud in procuring it; and insists that they each knew it would, and intended it should operate as a discharge of their share in such legacy.

The answer further alleges, that Charles Y. Lyman, at the age of seventeen, was put in the counting house of Horatio Gates, as a clerk and book-keeper, until he should arrive at the age of twenty-one years, where he received a considerable salary, in all, amounting to more than his share in said legacy, which he was permitted to retain and put to his own use, by the consent of said Phineas, he thereby intending to compensate him for his share in said legacy.

The answer further alleges, that the said Mary Jane was born in the year 1814, and has received her full share of such legacy, in education necessary and suitable to her degree, and beyond the proper means of said Phineas.

The answer further insists, that the cause of action accrued to the orators more than eight years before the bringing of this bill, and that, during all that time, two of the said legatees having been of full age, all right of action is barred by the statute of limitations.

The orators traverse the answer, so far as it alleges that the executors took possession of the estate severally, and not jointly; and that Lyman took possession of said legacy, against the will of said Buell; and that at the time of the testator's decease, Lyman was poor, and all that part which sets up the support and maintenance of the children in discharge of the legacy, and also, that Julia and Maria had discharged their shares in said legacy.

Testimony having been taken, the case came on for hearing before the court, at the December term, A. D. 1834, when the court decreed in favor of the orators, for the full amount of the legacy, and interest on the same, up the time of the decree.

The defendants having obtained a re-hearing, the case was continued at the January term, 1836, on account of the death

of the administrator of Buell; and now, George P. Marsh having been appointed administrator *de bonis non*, and the orators having brought their bill of revivor, the case came on for hearing, on the petition for *rehearing*, at the January term, 1837, one of the orators having in the mean time deceased and no bill of revivor being brought.

*Wm. Weston, for orators.*—All the matters of defence, contained in the defendant's answer, are stated under the allegation that he is informed and believes they are true. From the nature of the matters thus insisted upon, it will at once appear, that such supposed facts could not be within the *personal* knowledge of Frederick Buell, and the answer being traversed, the only benefit the defendant can derive from such allegations, would be the right of introducing evidence to support them. *Clark's Exrs.* v. *Van Remsdyk*, 9 Cranch, 153. Same case 3 U. S. Cond. Rep. 319. *Atwater* v. *Fowler*, 1 Edward's Ch. Rep. 417. *Hart* v. *Ten Eyck*, 2 Johns. Ch. Rep. 88, and note.

It would have been the joint, as well as the several duty of the executors to pay the legatees, at the expiration of one year, after the testator's death, had the legatees been competent to receive their portions and execute valid discharges to the executors.

But as the legatees were all minors, the executors, as faithful trustees, ought to have secured the amount of the legacy to the legatees, that they might have received the same, with interest, on their arriving severally at full age. And this was as much the duty of Buell, as of Lyman,

Buell was the acting executor. He had most of the assets in his own hands, and was specially directed as to the payment of this and other legacies by the decree of the court of Chancery, made in 1818.

II. Although one executor is not liable for the devastavit of his co-executor, yet, if one executor possesses assets, and passes them into the hands of a co-executor, who wastes them, both are liable. So if one executor concurs in a misapplication of his co-executor, both are liable. So if they act as joint executors, and where two join in a receipt for money, which comes to the hands of one who wastes it, both are liable. *Sadler* v. *Hobbs*, 2 Bro. 114. *Scurfield* v. *Howes*, 3 Bro. 90. *Joy* v. *Campbell*, 1 Sch. & Lef. 328, 340. *Langford* v. *Gascoyne*, 11 Ves. 333. *Shipbrooke* v. *Hinchinbrooke* 11 Ves. 252.

Same case, 16 Ves. 477. *Brice* v. *Stokes*, 11 Ves. 319. Chittenden, January,
*Crosse* v. *Smith*, 7 East. 246. *Underwood* v. *Stevens*, 1 Mer. 1837.
712. *Monell* v. *Monell* 5 Johns. Ch. R. 283. *Doyle* v. Sparhawk & Others.
*Blake*, 2 Sch. & Lef. 229.

v.
Admr. of
Ozias Buell
and Others.

Where executors give a joint bond, one is liable for the devastavit of the other. 1 Swift Dig. 449. *Brazier* v. *Clark*, 5 Pick. 96.

III. The act of Phineas Lyman, in appropriating the legacy to himself, if regarded as a payment, (as the defendant insists) must be regarded in this wise—

Phineas Lyman, as executor, pays Phineas Lyman, as parent, the legacy in question, and we contend that such payment is void. Toller, on Executors, 314. *Rotheram* v. *Fanshaw*, 3 Atk. 629. *Horrell* v. *Waldron*, 1 Vern. 26. *Genet* v. *Talmadge*, 1 Johns. 3. *Williams* v. *Storrs*, 6 Johns. 353. *Miles* v. *Boyden*, 3 Pick. 213. In *Dagley* v. *Tolferry*, 1 P. Wms. 286, where the legatee had rested fifteen years after payment to the father, the Chancellor decreed the payment again. Same case, 1 Eq. Cas. 300.

IV. The filing of the separate accounts of Lyman and Buell, in the probate office, wherein Lyman credits the estate for this legacy, and the same having been allowed by the Judge, can have no effect upon the case, as that act of the probate court was subsequently annulled, in requiring of the executors to render a joint account.

Neither can the allowance of the joint account of the executors by the probate court, wherein this legacy *is falsely represented to have been paid in pursuance of the decree of the court of Chancery*, be a bar to the orator's claim.

The decree was made without notice. This appears upon the face of the record, and hence it could not bind those who did not appear. Toller, 492

The orators were not bound to appear and object to the allowance of the executors account in order to save their rights. Toller, 494. *Beatty* v. *State of Maryland*, 7 Cranch, 281.

The accounts of the executors were examined for the purpose of ascertaining the amount to be paid over to the residuary legatees, and, whether the item respecting this legacy had been for so much retained by the executors, to be paid; or that such a sum had been paid, the decree would have been made, allowing the account, for the result would have been the same

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr of
Ozias Buell
and Others.

to the residuary legatees, who were entitled to nothing more than the residue, after the other legatees were paid or provided for.

Probate courts are courts of limited jurisdiction, deriving their whole power from the statute ; and if it appear from the face of their proceedings, that they have exceeded their power, their orders and decrees are void. *Hunt* v. *Hapgood*, 4 Mass, 117. *Sumner* v. *Parker*, 7 Mass. 79. *Hardwick* v. *Cleaveland*, 2 Vt. Rep. 329.

This is not a claim against the testator's estate, that required adjudication by commissioners.

The claim is established the moment the will is proved, and if the estate is solvent, and the executors receive assets, they, from that moment, become the trustees of the legatees, and our statute gives no power to the probate court to compel the legatees or *cestui que trust*, to litigate their claims in that court.

V. That part of the defendant's answer, in which he alleges that Lyman expended the legacy in the maintenance of his children, " conceiving that he had a right so to do," is wholly unsupported by the evidence.

The petition of the executors, brought before this court in 1817, states that this legacy, among others, remained unpaid.

The testimony shows conclusively, that Lyman was of sufficient ability to support and educate his children in the manner they were educated and supported.

Lyman continued to support his family until he failed in 1823 or 1824. Since then, they have supported themselves and assisted to support him, and such is the evidence.

The amount of wages received by Charles could not much exceed his expenditures, but whether they did or not, as Lyman never intended that the amount so received should be a matter of account between himself and Charles, it is not a matter that ought to be enquired into now. *Chase* v. *Elkins*, 2 Vt. Rep. 290. *Whiting* v. *Earle and Trustee* 3 Pick. 201.

It is the duty of parents to educate and support their children, and, while the father is able to do so, their separate property cannot be appropriated to their support. Reeves' Dom. Rel. Ch. 9. p. 283. 1 Bla. Com. 446. Toller, 326.

The allegation that Lyman thus expended the legacy, " professing to act under the decree of the court," has no foundation in truth ; to say that the decree was a permission to Lyman to

expend the money, as contended by the defendant, is a perversion of its meaning.

Chittenden,
January,
1837.

The petition, although stated to be for the benefit of the legatees, as well as of the executors, was, in fact, brought by the executors for their own benefit.

Sparhawk &
Others
v.
Admr. of
Ozias Buell
and Others.

As Lyman never made any claim against his children for their maintenance, Buell ought not to be permitted to do so.

If he had, in fact, appropriated the legacy to the maintenance of his children, and such appropriation were to be regarded as payment, we insist that payment of a legacy to an infant is void. *Davies* v. *Austin*, 3 Bro. C. R. 178. Same case, 1 Ves. 249. *Lee* v. *Brown*, 4 Ves. 362.

If he wrongfully received or appropriated the money, he stands as a debtor to the estate, and if Buell is allowed to set off against the legacy the childrens' maintenance, it would be compelling the children to pay their father's debt.

This is not a case where a claim for maintenance ought to be allowed, were Lyman to make the claim himself.

The former rule in England was, that in no case, where property had been given by a stranger to infants, could it be broken in upon during the life of the father, for their support. *Andrews* v. *Partington*, 3 Bro. 60. *Mundy* v. *Howe*, 4 Bro. 224. *Hughs* v. *Hughs*, 1 Bro. 387. *Butler* v. *Butler*, 3 Atk. 60. *Darley* v. *Darley*, 3 Atk. 399.

The rule was afterwards changed so far as to allow the interest, and, in extreme cases, the principal of the infants' property to be appropriated to his support, when the father was unable to support his child, or when the child's estate was large and the parent's estate small. *Greenwell* v. *Greenwell*, 5 Ves .195,and cases there cited in note. *Chambers* v. *Goldwin*, 11 Ves. 1. *Sherwood* v. *Smith*, 6 Ves. 454. But see case. *Exparte Bond*, 8 Cond. Eng. Ch. Rep. 73, where the modern rule is refused, and the former rule adhered to. But each case is decided upon the particular circumstances attending it.

We doubt whether such a decision, as the one made in the case of lord Petre, would have been made in England, had the parties been *tradesmen* instead of *nobles,* and until Dukes and Lords become as powerful in the United States as they are in England, we do not apprehend that such decisions will be recognized by our courts, as a part of " *the common law of England, applicable to our situation and circumstances.*"

Chittenden,
January,
1837

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

VI. The statute of limitations does not apply to a legacy. *Higgins* v. *Crawford*, 2 Ves. jr. 571. *Parker* v. *Ash*, 1 Vern. 256. *Arden* v. *Arden*, 1 Johns. 313. *Decouche* v. *Savetier*, 3 Johns. 190, 217.

But we insist that no action at law could be maintained. Fonb. Equity, 565 and note. *Wind* v. *Jekyl*, 1 P. Wms. 575. *Deeks* v. *Strutt*, 5 Term. Rep. 690. *Farwell* v. *Jacobs*, 4 Mass. Rep. 634.

This is the doctrine established in England, and since the case of *Deeks* v. *Strutt*, no case is to be found where a legatee has attempted to enforce his claim at law.

In New York and Massachusetts, and Pennsylvania, an action at law is given by statute.

In this State, our statute gives no such action ; but, on the contrary, where an estate is represented insolvent, it enacts that *no action shall be commenced against any executor or administrator*, except in certain cases therein excepted. Stat. p. 355. S. 97, and this is not a case within the exceptions of the statute.

2. If the claim could have been enforced at law, we are not barred by the statute, for our remedy upon the probate bond is not within the statute.

This question was so decided by the Supreme Court in Franklin county, in the case of the probate court against Chandler, 7 Vt. Rep. 111.

The defendant contends that the bond is void, not being in conformity with the statute.

The bond, we say, *is* in conformity with the statute. Old Stat. Vol. 1 124. S. 16, enacts, "That every executor or ex-" ecutrix shall give bond to the Judge of probate, with sufficient " surety or sureties, to return, upon oath, a true and perfect in-" ventory of the estate of the testator into the probate office, " within such time as the Judge of probate shall direct, *and to* " *render an account of his or her proceedings thereon in the* " *same manner as administrators are by law obliged to do*."

The same statute also enacts, p. 129. S. 26, "that administrators shall give bond," &c. and prescribes the form of the condition, and after stating the manner, in which the administrator shall inventory the estate in the probate office, proceeds in the words following—" and the same goods, chattels, rights, credits " and estate of the said deceased, &c. do *well and truly admin-* " *ister according to law*, and further do make or cause to be " made, a *true and just* account of said administration," &c.

Now let us see what bond executors must give to comply
with the statute.

They must give a bond that they will make a true and just
account of a faithful administration, *according to law ;* this
clearly implies, that they must first *faithfully administer ac-*
*cording to law,* for otherwise they could not render such an ac-
count ; consequently, the condition of the bond must be *for a*
*faithful administration according to law,* for without such a con-
dition, the subsequent one, " that he would render a true and
" just account of said administration," would be nugatory : and,
as the statute does not prescribe the form of the executor's bond,
but only the substance, we are to examine the bond given in the
present case, to ascertain whether the substance of the statute
has been complied with or not.

The bond corresponds precisely with the form given in Fes-
senden's book of forms, p. 325.

In the case of *Seymour* v. *Beach,* 4 Vt. Rep. 493, a levy of
an execution is sustained, being in the form prescribed by Judge
Chipman, although the levy under that form, is evidently bad.

We are aware that it has been decided in the English courts,
that where some covenants or conditions are void at common
law, and others good, a bond for the performance of all is good,
so far as respects the covenants that are good, but otherwise, if
any of the covenants or conditions are made void by statute.
Willes, Rep. 571.

It cannot be contended that there is any thing in this bond
that makes it void, either by common law or by statute, and if
the executors saw fit to give this bond in peference to following
the statute more precisely than they have done, it is good as a
voluntary bond. *Town of Pawlet* v. *Strong,* 2 Vt. Rep. 442.
*Thomas, Judge,* v. *White,* 12 Mass. Rep. 367. *Clap* v. *Guild,*
8 Mass. 153. *Arnold* v. *Allen,* 8 Mass. 147. *Morse* v. *Hodg-*
*son,* 5 Mass. 314. *Hall, Judge,* v. *McKay,* 9 Pick. 395.

This is not a bond for ease and favor, therefore, the case re-
ported in Chipman's Rep. 47, is not in point. See *Bache*
*et al.* v. *Proctor,* 1 Doug. 382.

But we contend, that the qualifying clause of the sentence,
viz. " in the same manner as administrators are by law obliged
to do," by the grammatical construction of the sentence, applies
to the character of the *bond,* and not of the accounting. The
executor is to give a bond to return an inventory *and* to render

Chittenden,
January,
1837.

Sparhawk &
Others.
    v.
Admr. of
Ozias Buell
and Others
an account in the same manner as administrators are by law obliged to do.

This view of the statute suggests two remarks :

1. That it contains no *specific form* for an executor's bond.

2. That it refers to the form of an administrator's bond in Sec. 26, as the guide for an executor's bond.

It does not require the latter to be made in the same *form*, for the term would imply the adoption of the same words, which would be absurd, since the duties of administrators and executors differ in some essential particulars. It therefore requires an executor to give his bond in the same " manner" as administrators are obliged by law to give their bonds, employing a term, requiring the insertion of every condition common to both, and authorizing the omission of duties not applicable to an executor's office.

The clause of the bond, objected to in the present case, was, therefore, rendered necessary to be inserted, by both the spirit and the plain words of the statute, and this view of the statute is sustained by the case of *Hall, Judge,* v. *McKay,* 9 Pick. 395.

The statute, under which the bond in the present case was given, was copied almost verbatim from the Massachusetts statute.

VII. The orators further insist, that this suit could· not have been prosecuted before the commissioners upon the estate of Ozias Buell, it being a matter cognizable only in a court of Chancery, and the authorities above cited, under the 6th point, fully sustain this position. The statute, requiring all claims to be presented to commissioners, can only have reference to claims that can be enforced at law ; the proceedings before commissioners are proceedings at law. They have no chancery powers, and an appeal is allowed from their decision to the County Court.

2. The bond being a joint and several one, if either of the sureties were compelled to pay, the surety could recover of Buell's administrator, or heirs, such amount, in an action for indemnity. *Babcock* v. *Hubbard et al.* 2 Conn. Rep. 536.

If the orators' claim could be eventually established and collected out of Buell's estate, shall they be turned out of court upon a technical objection ? for it cannot be viewed in any other light. Had the claim been presented to the commissioners, we should have been compelled to resort to chancery for a final de-

cision; for it is evident, from the whole case, that a court of law could not proceed with it.

Then ought this court to refuse to proceed with it, because we come to the fountain of justice in the first instance, instead of coming in by some of its tributary streams ?

VIII. The orators insist that the discharge, or receipt, given by Julia and Maria, was fraudulently obtained, without consideration, and, therefore, void.

A discharge given by a child, on his arrival at full age, to a parent, or to one standing in *loco parentis*, upon an inadequate consideration, is held void on the ground of the influence the parent is supposed to have over his child. *Hawes* v. *Wyatt*, 2 Bro. 156. *Cocking* v. *Pratt*, 1 Ves. Sen. 400. *Brace* v. *Taylor*, 2 Atk. 254. *Huron* v. *Huron*, 2 Atk. 160. *Hylton* v. *Hylton*, 2 Ves. Sen. 548. *Hatch* v. *Hatch*, 9 Ves. Jr. 292.

So a conveyance, obtained from persons uninformed of their rights, will be set aside, though there be no actual fraud. *Evans* v. *Lewellyn*, 2 Bro. 151. *Murray* v. *Palmer*, 2 Sch. and Lef. 474, 485, 486.

We further insist, that, at the time of the execution of the discharge, Julia and Maria were both minors, under the age of twenty-one years—hence the discharge is void.

Whether females are of full age at eighteen, or not until twenty-one, has never been decided in this State under the laws, as they existed, at the time of the execution of the discharge.

The constitution and statutes of this State leave the question unsettled.

At common law, females, as well as males, are not of full age until twenty-one. Bacon's Abr. 118. Infancy, A. Reeve's Dom. Rel. 227.

IX. We also insist, that we are entitled to interest from one year after the testator's death. This court so decreed in this case in 1818. *Smell* v. *Dee*, 2 Salk. 415. *East* v. *Thornberry*, 3 P. Wms. 126. *Bourke* v. *Ricketts*, 1 Ves. 333. *Sitwell* v. *Barnes*, 6 Ves. 520. *Earl Orford* v. *Churchill*, 3 V. and B. 59. *Wood* v. *Penoyre*, 13 Ves. 333. *Churchill* v. *Spealke*, 1 Vern. 251. *Gibson* v. *Bott*, 7 Ves. Jr. 97. *Pearson* v. *Pearson, et al.* 1 Sch. and Lef. 12. *Maxwell* v. *Wettenhall*, 2 P. Wms. 26. *Taylor* v. *Johnson*, 2 P. Wms. 504.

And where a legatee is compelled to sue for a legacy, he is entitled to costs as well as interest. *Glen and Wife* v. *Fisher*,

6 Johns. Rep. 36. *Caffrey* v. *Darby*, 6 Ves. 488. *Seers* v. *Hind*, 1 Ves. 294. *Piety* v. *Stace*, 4 Id. 620.

X. This is not a stale demand that can be looked upon unfavorably by the court. The bill was filed when the youngest legatee was only eighteen years old, and as the legatees must all join in the suit, no laches ought to be imputed to them, if they sue as soon as they can sustain an action in their own names.

*G. P. Marsh for defendant:*

I. This is supposed to be the first case, in which the courts of Vermont have been called upon to decide, how far, and under what circumstances, co-executors shall be liable for the misapplication of the effects of the testator, by each other.

Executors were formerly regarded with jealousy, scrupulously watched, and holden to rigid accountability, in the English Courts, both of law and equity.

The origin of this severity is to be found in the fact, that by the common law, executors had a beneficial interest in the personal estate of the testator, and it was not unreasonable that those, whose legal rights were large, should be confined strictly within those rights.

But executors are now, both in England and in the American States, in most respects, mere trustees for the next of kin. The rigor, with which they were treated has been gradually relaxed, and they are now regarded with the same favor, as persons in other fiduciary stations. The reasons which, in England, have led to a strict supervision of executors, have never existed in Vermont, and the substitution of new statute liabilities has here entirely done away many of their common law liabilities, and greatly diminished others.

The statute regulates every branch of their official duty, and expressly gives an action, not only on the bond, but upon every decree of the probate court. That court has power to make *every* decree necessary, in the progress of the settlement of estates, whether of payment of debts or legacies, or of distribution of the residue, and its decrees may be enforced by process of commitment from the court itself.

Inasmuch, then, as original jurisdiction is vested by statute in the probate court, for all necessary purposes, it would seem, that the statute intended to impose no liabilities upon executors, except such as arise from disobedience to, or non-compliance with the lawful decrees of that court. It is further material to

observe, that the defendants were executors of an estate *repre-*
*sented insolvent,* and, as such, had duties to perform, and liabili-
ties to meet, which are wholly unknown to the common law.
The executor of an estate, represented insolvent, though nomi-
nated by the testator, is a mere creature of the statute, and has
no other duties than such as the statute points out. He is mere-
ly the collecting and disbursing agent of the probate court, deri-
ving his power rather from the court than from the will, bound
by all its decrees, originally accountable to that tribunal alone,
and not responsible for its errors. The probate court is, with
us, the general guardian of the rights of infants, creditors, and
legatees, and combines most of the functions of both the chan-
cellor and ordinary in England. Nor does it alter the case, that,
in the present instance, the estate of the testator proved to be
solvent in fact, for the courts of this State recognise no distinc-
tion between solvent estates, represented insolvent, and estates
insolvent in fact. *Atherton* v. *Flagg & Parker,* 2 Chip. 61–66.

But as it has been contended, that joint executors in Ver-
mont are, by virtue of their bond, rendered liable for each others'
acts and defaults, to a greater extent than they were at com-
mon law, it becomes necessary to refer to the bond given by
these defendants, and the statute under which it was taken.

By the statute in force at the date of the bond, 1 Old Comp.
Laws, p. 124. Sec. 16, it is enacted that the executor shall
give bonds " to return upon oath a true and perfect inventory of
the estate of the testator," and " to *render an account* of his or
" her *proceedings* thereon, in the same manner as *administra-*
" *tors* are by law obliged to do ; *unless* such executor is resi-
" duary legatee, *in which case,* bond may be given to pay the
" *debts and legacies* of the testator;" but he is not required to
give such security in *any other case,* or to give bond for *faith-*
*ful administration,* under any circumstances.

By refering to Sec. 26, p. 129, 130, we find that the *admin-*
*istrator's* bond contains a condition, that he " shall make, or
" cause to be made a true and just account of his said adminis-
" tration ;" and *distinct* conditions of *faithful administration,*
and *payment of the residue* in his hands to such persons as the
probate court shall appoint.

By the common law, executors were not required to give
bonds, the confidence reposed in them by the testator being
in the place of a bond, whereas security was always required

Chittenden
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

of administrators ; and it is most obvious, that it was the intention of the statute merely to require security for the *additional duties* imposed by the statute itself, and not to add any thing to the common law *liability* of the executor. The object of requiring an inventory, and the rendering of an account, was to oblige the executor to furnish record evidence of the amount in his hands for distribution, in order that the creditors, heirs and legatees might know the sum. to which they were entitled, and at whose hands they should look for it.

The giving of a bond would serve : not only as a security against the omission of these duties, but as an inducement to the executor to their speedy ˙performance, and it is plain that the bond was intended to have no further force, from the fact, that the statute excludes security for *debts and legacies* in express terms, and for *faithful administration* by clear implication.

The bond, given by Harrington's executors, does not conform to the statute. Besides the two conditions specified by the act, it contains a condition that the executors " shall well and truly administer," &c.

If this clause has any peculiar force or meaning not embraced in the conditions required by the statute, it is void, because not authorized. *Lyon* v. *Ide,* 1 D. Chip. 46. *Hall* v. *Cushing et al.* 9 Pick. 398, 404. *Probate Court* v. *Matthews,* 6 Vt. Rep. 269, 275.

But it is conceived, that, even if valid, it is not broad enough to charge the defendants with the legacies.

Whatever may be the sense of the word " *administer,*" in the English law, its meaning, under our system, must be restricted to the *collection of debts due the estate,* and *raising money to pay those due from it.* The *distribution* of the moneys and other effects is secured by a distinct condition in the bond given by *administrators,* and the word cannot mean more, when improperly introduced into an executor's bond, than when properly used in that of an administrator.

It will be observed, that the bond given in the present case omits the condition of payment, which, in the statutory form of an administrator's bond, immediately follows the clause providing for the rendering of the account, but the orators contend, that that clause has of itself the same force. .

The only sound and sensible construction of this condition is the contemporaneous exposition of it given by the court in the

*Judge of Probate* v. *Pratt,* 1 D. Chip. 233, where the very question was decided.

But admitting, for the sake of argument, the validity of the bond, we insist, that it does not vary the common law liability of executors for the acts and defaults of each other, but it merely increases the security against those acts and defaults, by increasing the number of persons responsible.

The liabilities of executors arise, not from their bond, which is a mere security, but from the duties imposed by law, and the bond is to be construed, *reddendo singula singulis.* The surety and the delinquent executor are liable for the separate acts and defaults of each, and all the obligors for the joint act and default of all the executors. See *Kirby* v. *Turner,* Hopkins, 309, where this point is ably discussed and decided.

These arguments, we think, establish the position, that the executors of the will of a testator, whose estate is represented insolvent, are under no liabilities, except such as are imposed by statute, and inasmuch as neither the statute nor the bond render them sureties for each other, as to the payment of legacies, those, only, who have assets in their hands applicable to that purpose, are liable to the legatee, and *at least,* that, at all events, the responsibility of joint executors, under our statute, is, in no respect, *greater* than at common law.

II. But if the executors are to be treated as liable for the acts of each other in the same way, and to the same extent, as at common law, it becomes necessary to enquire what degree of mutual responsibility the common law imposes.

It is a principle well established, that if executors or other trustees have not been designedly guilty of a breach of trust, courts will favor them, and will endeavor to relieve them from any loss, which may happen from a misapplication of trust money. 2 Mad. Ch. 114. *Powel* v. *Evans,* 5 Ves. 839, 843.

1. If there are two or more co-executors or other trustees, one is not liable for the trust moneys, of which the other has possessed himself, even though there has been a misapplication, unless he concurs therein. *Fellows* v. *Mitchell and Owen,* 1 P. Wms. 81, 83 and *note.* 2 Mad. Ch. 129. *Hargshorpe* v. *Milforth,* Cro. Eliz. 318. *Balchen* v. *Scott,* 2 Ves. Jr. 678. *Shipbrooke* v. *Hinchinbrooke,* 11 Ves. 252. *Brazier* v. *Clark,* 5 Pick. 96, 104. *Brown's Executor* v. *Edgar,* 1 Dallas 311. *Raynor* v. *Pearsall,* 3 J. C. R. 579, 584, 586. *Thompson* v.

Chittenden,
January,
1837.

Sparhawk
and Others
v.
Admr. of
Ozias Buell
and Others.

*Brown*, 4 J. C. R. 619, 623, 628, 629. *Sutherland* v. *Brush*, 7 J. C. R. 17, 22. *Douglass* v. *Satterlee*, 11 J. R. 16, 21. *Manahan* v. *Gibbons*, 19 J. R. 427, 440. *Kirby* v. *Turner*, Hopk. C. R. 309, 330, 331.

Now the evidence in the present case shews that every thing has been done on the part of Buell, in the most perfect good faith, and he appears to have acted with reasonable discretion. There is no *lata culpa*, none of the *crassa negligentia*, which, as Lord North, 1 Vernon, 144. 1 Mad. Rep. 290, says is necessary to charge an executor.

Lyman was a co-executor, and, of course, in the confidence of the testator. He was the partner in business of the testator, nearly or quite to the time of the death of the latter, and was a creditor of the estate.

He was also an attorney by profession, and of fair character.

It was necessary to employ some one to collect the demands due the estate, and those circumstances pointed out Lyman as the fittest person for that purpose. *Thompson* v. *Brown*, 4 J. C. R. 619, 623, 628, 629. *Rowth* v. *Howell*, 3 Ves. 565.

2. Buell ought not to be liable for the misapplication of other funds by Lyman, because he could not draw them out of Lyman's hands. Lyman was a co-executor, and therefore had a clear legal right to retain the funds as against the other executors. He appears to have accounted not only for all the funds received from Buell ; but for all others, except enough to satisfy the legacy to his children, and this he retained in the settlement of his account with the probate court.

III. There is a well founded and well settled distinction between the claims of mere *legatees*, and those of *creditors*. The latter being entitled to the utmost benefit of the law, executors have sometimes been holden liable to them on hard grounds, such as merely joining in a receipt, though one alone had the money.

The same principle has also, in some cases, been extended to heirs and distributees, whose claims are founded upon natural right, and the laws of the land. But the claim of a stranger legatee, to whom the testator owed no duty, is a mere equitable right, and no case can be found where an executor, innocent of concurring in the misapplication of funds, has been holden liable to a mere legatee. There seems to be no reason why a legatee, who has no responsibilites, should be thought to have greater

equity than an executor, who has so many, where the latter is Chittenden, January, 1837. not in fault. *Churchill* v. *Hobson*, 1 P. Wms. 242. S. C. Salk. 318. *Brown's Ex.* v. *Edgar*, 1 Dallas, 311.

Spa-hawk & Others. *v.* Admr. of Ozias Buell and Others.

Having now considered the more general principles of equity governing the liability of executors, we shall proceed to examine the facts in issue, and the evidence, by which they are established.

The bill is a common bill for a legacy, differing ,in the stating part, in one particular only, from the common form.

In addition to the usual charges, it alleges that after two of the female legatees arrived at the age of eighteen years, they were induced by the false and fraudulent representations of two of the executors, without any consideration, to give a writing acknowledging payment of their respective shares of the legacy, of the purport of which they were ignorant, until four or five years afterwards.

It is important to notice, that this last matter is repeated in the charging part of the bill, and that the defendants are particularly interrogated, whether the discharge was not obtained by fraud, whether the legatees, who executed it, were not ignorant of its contents, and whether any and what consideration was given or paid for it, as the answer of the defendant Buell is unquestionably thereby rendered responsive to the bill, and, of course, evidence conclusive for him, unless disproved by two witnesses. *Smith* v. *Brush*, 1 J. C. R. 459, 461, 462. *Stafford* v. *Bryan*, 1 Paige, 239, 242. *Woodcock* v. *Bennett*, 1 Cowen, 711, 743. *Smith* v. *Clark and Smith*, 4 Paige 368, 370, 373.

In like manner, that portion of the answer, which alleges that . the executors *severally* and *not jointly* possessed themselves of the effects of the testator, is made evidence by the statements, charges, and interrogatories of the bill.

Moreover, the orators have chosen to put in issue the following facts only.

1. That the executors acted severally, and not jointly.

2. That Lyman possessed himself of assets, and retained the legacy against the consent of Buell.

3. That Lyman was poor at the time of testator's death.

4. The satisfaction of the legacy by the moneys expended in the support and maintenance of the legatees, and the wages of Charles.

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

5. The allegations of the answer respecting the discharge by the two elder legatees.

The answer alleges,

1. The representation of insolvency of the estate of Buell, and the non-presentment of the orators' claim to the commissioners on his estate, and *insists* that the orators are barred by this neglect.

As to this point the answer is *not traversed*.

2. That Harrington's executors *severally* and not *jointly* possessed themselves of his estate. That his estate was represented insolvent and commissioners appointed, who, among other things, allowed Lyman $2164,61, and that the estate was settled in due course of law, under the direction of the probate court, and all debts and legacies paid.

The only facts traversed under this head, are that the executors *severally and not jointly* possessed themselves of the testator's effects, and the payment of the legacy ; the residue moreover appears from the probate record.

As to the matters traversed, the answer has already been shewn to be responsive to the bill, and, of course, evidence.

3. That Lyman had choses of testator in his hands at the time of testator's death, and afterwards severally possessed himself of other choses, to the value of four or five thousand dollars.

The statements, charges, and interrogatories of the bill make the answer evidence on this point also, so far as material.

The answer is unquestionably evidence, so far as it alleges Lyman's expenditures, as the consideration of the receipt given by the elder legatees, and if the other evidence adduced by the defendants be insufficient fully to establish the facts, as to all the legatees, it is a proper subject of inquiry by a master.

The answer, also, is evidence that the discharge was understandingly given, after the legatees arrived at full age, without fraud or concealment, and in consideration of moneys expended for them by Lyman, the statement of these facts being directly responsive to the bill, and utterly uncontradicted by any legal evidence.

It is objected, that the allegations of the answer are not to be received as proof, even where they would otherwise be evidence, because, as to some of them, the defendant swears " that he is *informed* and *believes*." This is the proper mode of alleging facts not within the absolute personal knowledge of the defen-

dant, however great may be his moral certainty of their truth, and, uncontradicted by legal evidence, is as conclusive as the most positive declarations.

To disprove the allegations of the answer, the only material evidence is that of the wife of the defendant Lyman, and mother of the legatees.

But her testimony is wholly inadmissible.

Though Lyman has not answered, F. Buell's answer is a defence for all the executors, and if he is discharged the orators cannot have a decree against Lyman and King.

The effect of her testimony, therefore, would be to charge her husband. *Clason* v. *Morris*, 10 J. R. 525, 542. *Cole* v. *Gray*, 2 Vernon, 79. *Vowles* v. *Young*, 13 Ves. 144. *Le Texier* v. *Margrave of Anspach*, 6 Ves. 323. *Alban* v. *Pritchett*, 6 T. R. 680. *Barron* v. *Grillard*, 3 V. and B. 165.

Nor will the husband's assent enable her to testify. 1 Phil. Evid. 66.

Authorities are not wanting to show that if orator calls on a defendant to testify, he waives relief against him, and of course against those chargeable for his default. *Harvey* v. *Tebbuts*, 1 J. & W. 197, 203. *Weymouth* v. *Boyer*, 1 Ves. Jr. 417, 419, 420, 426. 1 Hoffman's Ch. Pr. 485. *Thompson* v. *Harrison*, 1 Cox, 344.

If this doctrine be law, it is not easy to see why the attempt to charge him and his fellow-executors, through the testimony of his wife, should not be attended with the same results.

If Lyman wasted or misapplied the effects of the testator, it was not funds received of Buell.

IV. If Buell is to be considered as having assented to Lyman's retaining the legacy, or even as having paid it to him, it is a good payment in discharge of Buell.

1. Lyman had a right to control the estate of his minor children, as their natural guardian, until divested of this power by the court of chancery. Reeve's Dom. Rel. 290, 320, Swift's Dig. 49. 1 Black. Com. 452, 461. *Holloway* v. *Collins*, 1 Ca. Ch. 245. See also the late case of *Paine* v. *Low*, *Russel and Mylne* 223. 4 Cond. Eng. Ch. Rep. 397.

And although the right of the father to control the estate of his infant child has been denied in some of the States, yet the courts appear to have gone upon the ground of peculiar statutory provisions, and it is worthy of remark, that no case is to be

Chittenden,
January,
1837.

Sparhawk &
Others
v.
Admr. of
Ozias Buell
and Others.

found of the appointment of a stranger guardian, while the father is living.

2. The decree upon the petition in chancery did not divest him of this power, but ought rather to be regarded as a permission to expend the legacy for the benefit of his children.

It was a decree which the court had power to make. *Gregory* v. *Molesworth,* 3 Atk. 626, 627. Jeremy Eq. Juris. 217, 220. 1 Mad. Ch. 267. See also authorities cited below, on the subject of maintenance.

The notice and appearance were sufficient, *Thompson* v. *Jones,* 8 Ves. 141.

The prayer of the petition is, that the money might be paid to the parents for the *b nefit* of the children, and the decree was that the parents should give security *" to pay to, or account with"* the children for the legacies. If the executors were all jointly liable, as the orators contend, there could be no "benefit" to the legatees by withdrawing the legacies, as the security would be thereby lessened, unless they were to be expended. The decree was in the alternative "to pay to, OR account with.' *Accounting* implies both debt and credit, and the petition and decree are both nugatory upon any other construction.

3. Nor was any liability imposed upon Buell, by the decree, as *trustee.* Lyman then had in his hands funds sufficient to satisfy the legacy, nor did he ever receive assets from Buell afterwards. Buell had no power to *compel* him to give the security required by the decree, though he endeavored to *induce* him to do so. Lyman, being co-executor, had equal rights over the funds of the estate, and none of his rights, as co-executor, were diminished or impaired by the decree. He in fact was the trustee under the decree, and Buell nominally so, only.

It will be observed, that the decree did not clothe Buell with any power to invest, control or dispose of the legacy. The payments were to be made by the executors generally, and not by Buell alone, and the only duty imposed upon him was to suffer his name to be used as obligee, and to decide upon the sufficiency of the security which should be offered. As to the funds in his own hands, they were disposed of, according to the directions of the probate court. The duty of paying the legacy was incumbent upon Lyman, as well as upon Buell. If Lyman could not lawfully receive it, there was no person to whom it could be paid, and it must remain in the hands of some one of the executors until the legatees should attain their majority.

Chittenden,
January,
1837.

Spauhawk &
Others.
v.
Admr of
Ozias Buell
and Others.

Apart from the decree, other considerations pointed out Lyman as the fittest among the executors to have the custody of the fund, and the passing of the legacy to his separate account, allowed by the probate court as a compliance with the decree, is of itself a good payment in discharge of the other executors.

The only breach of duty, then, under the decree, is the not furnishing of the security. But this breach was committed by Lyman alone, and for this he alone is responsible. The money retained by Lyman constituted the proper trust fund, and for the loss or misapplication of this fund, Buell, the supposed trustee, is not liable, for the simple reason that he never became possessed of it. But whatever liabilities Buell may have incurred, as trustee, it is clear he cannot be charged upon this bill, which seeks to charge him as executor only.

4. But it has been said, that the decree has no application to the case. That as Lyman gave no security, and there is no evidence to show that Buell paid him any money under the decree, it is to be treated as never having been complied with, and that therefore neither rights nor liabilities accrued under it.

If this be so, we still contend that the decree of the probate court, allowing the executors generally the amount of the legacy, by transferring it to the separate account of Lyman, in discharge of Buell, Harrington and King, is conclusive upon the legatees.

The probate court is a court of record, and its proceedings, unappealed from, are conclusive against all parties. The persons interested in the settlement of estates being usually numerous, the statute has dispensed with the service of personal notice to attend the settlement of the administration account, and has substituted a notice by publication. Thus cited, all parties interested have opportunity to appear, and are bound to take notice, and the proceedings of the probate court, which are in the nature of proceedings *in rem*, bind all the world. *Judge of probate* v. *Fillmore*, 1 D. Chip. 420, 423. *Wilson* v. *Keeler*, 2 D. Chip. 16, 20. *Harvard College* v. *Amory* 9 Pick. Rep. 446, 463, 464. 1 Starkie, Ev. 228. *Jenison* v. *Hapgood*, 7 Pick. 1, 7. Toller on Executors, 495.

Moreover the settlement has been long acquiesced in, and is therefore the more conclusive. *Hercey* v. *Dinwoody*, 2 Ves. Jr. 87, 93. *Higgins* v *Crawford*, Ibid, 571.

There can be no question as to the power of the probate court to prescribe the disposition of the funds, until the time of

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

distribution shall arrive. The Probate court had power to order the executors to pay over to the residuary legatees all the funds of the estate, except the legacy. But the executors could not pay the legacy into the probate court, and as they had no common place of deposit, it must of necessity remain in the hands of some one of them. If the probate court does not possess the power of directing which executor shall retain the money until the time of distribution, the absurd consequence would follow, that *each one* would have the right to retain against his fellow executors, and against the distributees, a sum sufficient to pay all legacies not yet payable.

V. Lyman is equitably entitled to be allowed for the maintenance and education of his children, even if the decree of the Supreme Court did not authorise the expenditure of the legacy.

Upon a petition expressly for that purpose, permission would have been granted to expend the legacy, and an allowance ordered as well for time *past,* as for the time to come. *Heysham* v. *Heysham,* 1 Cox. 179. *Collis* v. *Blackburn,* 9 Ves. 470. *Ex parte Green,* 1 J. & W. 253–254. *Ex parte Swift,* 4 Cond. E. C. R. 562. *Ex parte Chambers,* Ibid. 563. *Reeves* v. *Brymer,* 6 Ves. 425. *Sherwood* v. *Smith,* Ibid. 454. *Ex parte Lord Petre,* 7 Ves. 403. *Ainsworth* v. *Pratchet,* 13 Ves. 454. *Maberly* v. *Turton,* 14 Ves. 499–500. 1 Mad. Chan. 272–273. *Davies* v. *Howard,* 4 Mass. 97. *Matter of Bostwick,* 4 J. C. R. 100. *Wilkes* v. *Rogers,* 6 J. R. 566. –577–594. *Brown* v. *Temperly,* 3 Cond. E. C. R. 390. *Rainsford* v. *Freeman,* 1 Cox. 417.

If the Court would have allowed the legacy to be expended for the children, they will sanction the expenditure now. 2 Mad. Ch. 128. *Lee* v. *Brown,* 4 Ves. 369. *Howe* v. *Dartmouth,* 7 Ves. 137–150.

If Lyman is entitled to such allowance, the other executors may have the benefit of it, though he does not claim it.

VI. The statute of limitations is a good bar.

1. It is now settled that courts of equity will adopt the statute, in all cases where the party has a remedy at law. Angell on Limitations, 339. *Kane* v. *Bloodgood,* 7 J. C. R. 90–126. *Sturt* v. *Mellish,* 2 Atk. 610. *Souser* v. *De Meyer,* 2 Paige, 574. *Stafford* v. *Bryan,* 1 Paige, 239. *Wych* v. *E. I. Comp.* 3 P. Wms. 309. *Bertine* v. *Varian,* 1 Edwards, 343–344. *Atwater* v. *Fowler,* Ibid. 417–420. *Hovenden* v. *Annesley,*

2 Sch. & Lef. 607, 631. *Codman* v. *Rogers*, 10 Pick. 112, 119.

Chittenden, *January*, 1837.

Sparhawk & Others.
v.
Admr. of Ozias Buell and Others.

2. The legatees might have sued at law. *Morrill* v. *Morrill*, 2 N. H. Rep. 282. *Goodwin* v. *Chaffee*, 4 Conn. 163, 165, 166. 1 Swift's Digest, 455, 575. *Knapp* v. *Hanford*, 6 Conn. 170. 1 Old Comp. Laws, 152. § 81. *Van Hook* v. *Whitlock*, 3 Paige, 410–416.

Again, if the settlement in the probate court is not evidence of a payment to discharge Buell, Harrington and King, it is evidence of á liability to pay, upon which an action would have lain.

3. The bequest was a joint one, and, in case of the death of one of the legatees, would have survived to the others. Preston on legacies, 237, 238. *Martin* v. *Smith*, 5 Binney, 16. *Crooke* v. *De Vandes*, 9 Ves. 197. *Morley* v. *Bird*, 3 Ves. 628. *Webster* v. *Webster*, 2 P. W. 347. And where a claim is joint, if one is barred, all are so. *Perry* v. *Jackson*, 4 T. R. 516. *Marsteller* v. *McLean*, 2 Pet. C. R. 453. Starkie on Evid. prt. II. 901.

This defence may be insisted on by answer as well as by plea. *Bertine* v. *Varian*, 1 Edw. 343. *Norton* v. *Turville*, 2 P. W. 145. *Dey* v. *Dunham*, 2 J. C. R. 182. 191.

It is argued, that these legatees are entitled to a remedy on the bond, as well as by action of debt or assumpsit, and that because the presumption has not run upon the bond, they ought not to be barred in Chancery. But we, by no means, admit the soundness of the conclusion, though the premises be established. It is notorious, that bonds are required of executors in most, if not all the American States, yet the able courts in New York have often decided, that the statute is a good bar to a bill for a legacy, notwithstanding the bond.

But although the bond be valid as a security for the legacy, the force of this argument is entirely done away by the the provisions of our own statute § 12 p. 334, which, by compelling judgment for the penalty of the bond, deprive the party of the power of insisting on the presumptive limitation ; and as it cannot be imagined that the legislature intended to render the liabilities upon probate bonds perpetual, it must be concluded, that they designed to allow him to avail himself of the general statute of limitations upon the assignment of breaches. If this position be well founded, the statute is as available a defence in an action upon the bond, as in any other suit.

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

VII. The orators are barred by not presenting their claim to the commissioners on Buell's estate.

By our statute, p. 352, § 89, and p. 353, § 91, *all* claims and demands, not presented, are barred. This must, at least, embrace all claims of a nature to be enforced at law. We have already shown that the orators had a remedy at law, if at all, and the claim ought therefore to have been presented. *Gookin* v. *Sanborn*, 3 N. H. 491. *Brown* v. *Anderson*, 13 Mass. 201. *Paine* v. *Nichols*, 15 Mass. 264. *Burdick* v. *Green*, 8 Pick, 108. *Spaulding* v. *Betts*, 6 Conn. 28.

VIII. The receipt is a good discharge of the distributive shares of the two elder legatees.

The legatees were both more than eighteen years of age, at the time of its execution and therefore of full age. Const. Vermont, Art 1. Brayton, 124. And if not, their long acquiescence has established it, as the bill itself admits they knew its purport, within four or five years after its execution.

The receipt is *prima facie* good, and every presumption is in its favor. *Kirby* v. *Taylor*, 6 J. C. R. 242, 248, 249. *Kirby* v. *Turner*, Hopk. 309, 334.

Being *prima facie* good, the burden of proof is thrown upon the claimants to invalidate it. They adduce only the clearly inadmissible, and highly improbable testimony of Lyman's wife.

It has, however, been urged, that the answer itself shows that the receipt was without consideration, because it admits that no money was paid by the executors, *at the time* of its execution.

There is no principle better established, than that if orator reads any part of the answer, he makes the whole of the answer, relating to the same point, evidence. Moreover, we have already shown that the orators have, by the statements, charges, and interrogatories of their bill, put us to answer to the consideration, and have thereby concluded themselves.

The orators are obliged to read the answer, to prove that the money was not paid upon the giving of the receipt, and they thereby make the whole of the answer, relating to the consideration, evidence. *Smith* v. *Clark & Smith*, 4 Paige, 368, 373.

IX. But if the defendants are chargeable, interest should not be allowed. *Tyrrell* v. *Tyrrell*, 4 Ves. jr. 1.

*C. Adams, for orators, in reply.*

I. The claim was established by proof of the will, and, the sufficiency of assets being admitted, the orators were entitled to

their legacies, before payment to the heirs at law and residuary legatees.

II. All, who undertook the trust, whether as executors or administrators, *cum testamento annexo*, were jointly bound to the execution of it.   The authority derived from the probate Court, whether with or without a will, is joint, and the bond and undertaking are so.

It is of no importance whether Lyman possessed a portion of the assets, or not.   This claim rests on the same foundation as the claims of creditors, and, the estate being sufficient, the orators are entitled to payment, at all events.

Buell had ample funds of the estate, in his own hands, after paying all the creditors, to pay this claim, and actually paid a large amount to the residuary legatees.   He should have first paid the specific legacies, and his neglect to do so is the ground of complaint.   The orators were not the sureties of Lyman and are not to lose their claim, for his default.

The books make a distinction between the liabilities of trustess and executors for the acts of each other, making the latter liable in many cases, where the former would not be.   In one sense all executors are trustees, but, in this case, they are trustees because they are executors.   From the cases read on the other side, and the multitude that may be found in the books, the proposition may be deduced, that trustees are not liable for the separate acts of each other; but, when the money is under their joint control, and by any act, consent or agreement, one allows it to pass into the hands of his co-trustee, both are liable. *Murrell* v. *Cox & Pitt*, 2 Ver. 570.   *Chambers* v. *Minchin*, 7 Ves. 198, 186, and the cases of *Sadler* v. *Hobbs*, *Scurfield* v. *Howes*, *Shipbrooke* v. *Hinchinbrooke*, *Brice* v. *Stokes*, *Crosse* v. *Smith*, *Joy* v. *Campbell*, *Doyle* v. *Blake*, and *Morrell* v. *Morrell*, as cited by Mr. Weston, in the opening argument in this case.

No case cited on the other side, excepting *Fellows* v. *Mitchel*, and *Westly* v *Clarke*, are opposed to this proposition, and those cases have been frequently examined and disapproved. See case of *Murrell* v. *Cox & Pitt*, and other cases above cited.

But the examination of these authorities is scarcely necessary, as it is apparent that these executors acted jointly throughout. Their bond was joint, their accounts were joint, and their settlement was joint.

Chittendon,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

III. The appropriate remedy for the orators is to be sought in Chancery. In most cases discovery, as well as relief, is sought, and, in many cases, a provision is required, which Chancery, only, has the power to enforce, as in the cases of married women and infant children.

In some States, as in New York, Massachusetts, and, probably, in Connecticut, actions at law, for legacies, are authorised. N. Y. Stat. 2 Vol. 90, 91 and 114. 4 Mass. Rep. 635. The case of *Goodwin* v. *Chaffee*, 4 Conn. Rep. 163, has the merit of singularity. The Court declare that assumpsit will lie for a legacy, but rule the case for the defendant, on the ground that a legacy is not a *debt*, nor a charge upon the estate, so that the probate court could order a sale of real estate. In 6 Conn. Rep. 174, the Court assume the ground that their probate court has peculiar powers. It is founded on two old cases, from 1 Root, 419, and 2 do. 271, both of which were against persons taking an estate liable to a legacy, and not against executors.

An action at law, in this State, if sustainable, would not afford an adequate remedy. What could be done with a legacy of a picture ? or what, in cases providing for the maintenance of a wife or children, when specific execution, only, would be effectual.

But the authorities clearly show that an action at law cannot be maintained. *Deeks* v. *Strutt*, 5 T. R. 690, *Farwell* v. *Jacobs*, 4 Mass. Rep. 635. Toller on executors, 479. Fonb. Fq. 565.

IV. The receipt, signed by Julia and Maria, is not binding, on account of their minority at the time of its execution ; they being under the age of twenty-one years. 1 Bl. Com. 463. 2 Kent's Com. 233. It is also avoidable on the ground of want of consideration.

V. The father, if of sufficient ability, is bound to maintain and educate his children. 1 Bl. Com. 452, 461. 1 Swift's Dig. 49. *Farwell* v. *Jacobs*, 4 Mass. Rep. 635.

The Courts, in early times, seldom relaxed the rule, and only when children had large expectations. *Hughes* v. *Hughes*, 1 Brown, 387. *Andrews* v. *Partington*, 1 Brown, 60. *Davies* v. *Austen*, id. 178. *Lee* v. *Brown*, 4 Ves. 862.

In England, where children were entitled to large fortunes, an allowance has been made for their education. But this is in the spirit of their government, which studiously favors

aristocracy. *Maberly* v. *Turton,* 14 Ves. 499. *Lord Petre,* ex parte, 7 Ves. 403.

Chittenden,
January,
1837.

Sparhawk
and Otheis
*v.*
Admr. of
Ozias Buell
and Others.

VI. It is fully settled that a father has no right to receive a legacy, due to his children, without having first been appointed their guardian and given bonds. *Dagley* v. *Tolferry,* 1 P. Wms. 285. *Miles* v. *Boyden,* 3 Pick. 213. *Cooper* v. *Thornton,* 3 Brown C.C. 96. *Genet* v. *Talmadge,* 1 Johns. C. R. 1. *Rotherham* v. *Fanshaw,* 3 Atk. 629.

VII. The proceedings of this Court, which resulted in the decree of 1818, were based on the supposition that the legacies could not be paid to the father, without the aid of Chancery. Nothing was ever done under this decree, and, consequently, it affords no defence to this claim.

VIII. The proceedings in the probate court cannot affect the orators' claim, because they had no notice ; because they were minors and without guardians, and, especially, because that court did not act upon any question, which concerned them. The question of payment is a matter to be tried elsewhere, and is wholly without the jurisdiction of the probate court.

IX. It is objected to the recovery of this claim, because it was not exhibited to the commissioners on Buell's estate. But there is an evident distinction between debts and legacies, in this respect. The former exists against the person, and may be enforced during the life of the testator. The latter are claims against the estate only, and can have no validity until after the testator's death. Debts rest in contract and are to be proved by evidence. Legacies are created by the will and are proved by it, and no intervention of commissioners is necessary to establish them.

Besides, this bill was brought before any representation of insolvency on Buell's estate.

X. This case does not fall within any of the rules of limitation. It is a common maxim that time does not bar a direct trust. There may be trusts by implication, where the statute may be a bar, as in the case of *Lockey* v. *Lockey,* Prec. in Ch. 518, but it has no application to those trusts, which are creatures of the Court of Chancery. As long as the trust continues, the *cestui que trust* is not barred. This is the case, also, at law, as between tenants in common, mortgagor and mortgagee, and in the purchase of a trust estate with knowledge of the trust. It is well settled in England, that the statute does not attach to

Chittenden, January, 1837.

Spaihawk & Others. v.

Admr. of Ozias Buell and Others.

legacies and distributive shares. *Sturt* v. *Mellish*, 2 Atk. 612. *Lawly* v. *Lawly*, 9 Mod. 32. *Cholmondeley* v. *Clinton*, 2 Mer. 360. *Decouche* v. *Savetier*, 3 Johns. C. R. 216. *Kane* v. *Bloodgood*, 7 do. 126.

In New York, it was ruled by Walworth, chancellor, that the statute might be pleaded to a bill for a legacy, the statute having given a concurrent remedy to a court of law, as he remarked, but he added, that if a legacy were chargeable on land, it could not be pleaded. *Souzer* v. *DeMeyer*, 2 Paige's Rep. 577.

But there is no statute which, in terms, applies, and none by analogy. The statute of eight years is insisted upon. But that cannot apply when no commission has issued. And as this claim was not exhibited, it is not changed into a judgment, by the report of the commissioners. The statute of six years does not apply, for no suit at law, for the legacy, can be sustained. An action might lie upon the bond, but in that case the defendants could only rely on the presumptive bar of twenty years. Besides, an action on the bond would be for a different and distinct claim, and in order to oust chancery of its jurisdiction, it must appear that an action would lie directly for the legacy.

REDFIELD, Chancellor—delivered the opinion of the Court.

The court have not been so fortunate as to come to an unanimous determination in the present case. They deem the case of much importance, both in regard to the principles involved, and the amount in controversy, and it is to be regretted any diversity of opinion should exist in relation to the judgment now given. A majority concur in the following results.

The testimony does not sufficiently show, that Phineas Lyman was in such circumstances of poverty, as to warrant him before the time of his failure in the year 1824, in appropiating the property of his children for their maintenance or education. Before the time he went into trade, in 1818, he seems to have been an attorney, doing a small business, at that time reputed to be worth about five thousand dollars, owning a comfortable dwelling and outbuildings and lot, worth fifteen hundred dollars, which he continued to own till the time of his failure. In short, till the time of his failure, he was in easy circumstances to support and educate his family in an independent manner. And although during all this time, he might *in fact*, have been bankrupt, still, this question must be determined by his *apparent* and not his *actual* means. We ought not now to allow the defend-

ants to claim to have expended this legacy in the support, main- <span>Chittenden, January, 1837.</span>
tenance and education of the legatees, unless, at the time the
expenditures were in fact made, this court would, on application, <span>Sparhawk & Others.</span>
have decreed, that such expenditures should be made out of the <span>v.</span>
fund, from which it is now attempted to be drawn.  This court <span>Admr. of Ozias Buell and Others.</span>
would never have allowed the property of these orators, while
infants, under the control of a parent of ample ostensible means
for their support and education, to be expended for that purpose.

It is the duty of parents to maintain and educate their infant
children, " they being of sufficient ability."  The benevolent
object and true intent of such bequest, as the present, would
be almost wholly defeated, if parents were permitted to expend
the same without giving any security to account for it when
the child should come of age.  This court will order the guar-
dian of infants, under suitable security given for the faith-
ful discharge of the trust, to expend a reasonable amount of
the property of the ward in his maintenance and education, if
the ward is without parents, or they are wholly unable to main-
tain and educate their children in a manner suitable to their rea-
sonable expectations, and the court no doubt would allow a de-
duction for *past* maintenance, under the same circumstances.
This is not the present case.  And it does not appear that Ly-
man, or his children, up to the time of his failure, ever supposed
that he was expending this legacy in their support or education.
The children were educated respectably, but just as they would
have been, had this legacy never been made.  Since the failure
of Lyman, there is no pretence that any portion of this legacy
has been expended by him in the education of these children.

There does not appear to be any evidence, that Lyman inten-
ded Charles' wages, which he was permitted to receive and ap-
propriate, to go in lieu of his share of this legacy, and if such
had been the expectation of the father, and even of the son, he
would not be bound by it.  What is said of the education of the
other children is a sufficient answer to this claim.

It seems to be admitted by the answer, the proofs and argu-
ments, that the defendant Buell, who is the only defendant that
contests the claim of the orators, accepted the trust imposed by,
and made probate of, the will, and took possession of property
of the testator, to an amount more than sufficient to pay the
debts due from the estate, and pay all the specific legacies, in-
cluding the one now in controversy.

Chittendon,
January,
1837.

Sparhawk &
Others
v.
Admr. of
Ozias Buell
and Others.

It is an admitted principle that specific legacies ar e to be paid before any distribution is made to the residuary legatees, or to the heirs. A considerable amount of the funds, once in the hands of Buell, has actually gone to the residuary legatees. It is admitted and proved, that these legacies have never been paid to the legatees. It was as much the duty of Buell, as of any other of the executors, to see that this legacy was paid. He had the means of paying it, and had he in any way exonerated himself from this obligation ?

It is true that the amount of this legacy has gone into the hands of Lyman for the purpose of meeting this object. But the evidence does not show, that Lyman took possession of these funds without the consent of Buell. The notes and other property, which he did obtain without the consent of Buell, would not exceed the amount of his own debt, which he had a right to retain. The other property, which went into his hands, must be considered as having been originally in the joint possession of Buell and Lyman, and, in contemplation of law, to have gone into Lyman's possession by permission of Buell. Under these circumstances, it would hardly be contended, that Buell could exonerate himself from liability, unless by showing what was equivalent to payment of this legacy. One executor is not indeed liable for the *devastavit* of another joint executor, in regard to goods which have never been under his control, but, if he permit funds, once in his hands, to go into the possession of his co-executor, and he squanders them, he is liable. And, this is upon the ground that each executor is liable for the faithful discharge of the joint duties, but not of the several duties. Hence, it is very apparent, that the mere fact, that the funds have gone into the hands of Lyman, for the purpose of paying this legacy, and which he promised to apply, but wasted, is no answer in the case of Buell, to the claim of the orators. Lyman was the last man, who should have been permitted to have the control of these funds, unless under regular appointment and proper security. The relation of parent and child is one of authority and unlimited influence on the one part, and obedience and dependence on the other. And the inequality of this relation is not limited, in any sense, to the term of minority. Hence, it is unsuitable that the property of the child, which the donor intended should be separate and independent of the parent, should be under his control, in any sense. Courts of probate, or chancery,

in appointing guardians to take charge of the property of infants, would not, in a prudent discretion, ordinarily select the parents for guardians, after the age of nurture is passed. This disposes of another argument urged by the defendants' counsel, that Lyman, as natural guardian, had a right to the control of the separate property of his minor children. This would make the legacy in the present case virtually vest in the father, which evidently was not intended by the testator, and whose intentions, no court would be thus warranted in perverting, unless for very sufficient reasons.

Chittenden,
January,
1837

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

Upon two grounds then, we think that Buell was originally bound to see to the payment of this legacy, whenever the legatees should come of age, or should have a guardian properly appointed.   1. That he had either the separate or joint control of all the funds belonging to the estate, except what Lyman had a right to retain on his own debt, and, 2d. even if Lyman had obtained funds sufficient to pay this legacy, without the consent of Buell, and which had never been under his control, still, as Buell had funds over and above these, more than sufficient to pay this legacy, and which have since gone to the residuary legatees, he should have appropriated them first to the payment of this specific legacy, and let the residuary legatees pursue the funds in the hands of Lyman.

If it be supposed that this involves the absurdity, that each executor may retain the amount of each distinct legacy, and that the residuary legatees might as well call upon Buell for the amount in his hands, as to call upon Lyman; it will be perceived that the apparent absurdity results from the obligation of a joint administration, which makes each executor liable for the acts of all the other executors.   And had Buell wished to exonerate himself, he must have *compelled* the application of all the funds which he had *put* into Lyman's hands, as well as to *apply* those in his *own* hands.

It now remains to examine the several grounds, upon which the defendant Buell claims to be no longer liable to the demand of the orators.

1. It is said this claim is barred by the statute limitation of all claims, not presented to the commissioners on estates represented insolvent, the commission on the estate of Buell being now closed.   But when it is considered, that at common law the remedy for the recovery of a legacy is in Chancery, and

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

that it is now held, whatever might have been the earlier doctrine, that no action at law can be sustained directly for the recovery of a legacy or distributive share in an estate, it could hardly be said that the orators had a full remedy at law. If not, they might elect to pursue their claim in Chancery, as they did, the bill being brought pending the commission, when clearly no bar had attached upon the legal remedy, if any existed. But in analogy to the decisions in England, and in those States where courts of Chancery exist, we are inclined to hold that the appropriate remedy of the orators is only in Chancery. Of course they could have had no remedy before the commissioners, and have lost none by not presenting the claim to them. The cases in Connecticut and New Hampshire Reports, where it is held that a legacy may be recovered at law, seem to have been, in some measure, principles adopted *ex necessitate*, to help out an imperfect system of Chancery. A claim, which is not presented at the time of the commission being closed, or which is not strictly a legal claim, is never barred. *Jones* v. *Cooper*, 2 Aik. 54. *Blackmer* v. *Blackmer*, 5 Vt. 355.

2. The defendants insist upon the statute of limitations of eight years, as a defence to the orators' claim. It is undoubtedly true, that a court of equity will not lend its aid to revive claims barred at law by the statute of limitations, or lapse of time. Hence, if the orators claim be of such a character, that it comes within the provisions of any of the statutes of limitations, and the term prescribed has run, the claim cannot be asserted in equity even. But statutes of limitation operate upon the remedy, and not strictly upon the debt. If a party have two remedies, which are distinct and independent, although for the same debt, as a promissory note or bond for his debt, and a mortgage security upon land, and either be barred by the statute of limitations, he may still pursue the other. *Reed, Admr. of Craigin* v. *Shepley et al.* 6 Vt. 602. *Belknap* v. *Gleason,* 11 Conn. 160, and authorities there cited. But from what has been already said, it will appear that the court do not hold a legacy to be in the nature of a debt, owing by the executor and by him detained ; and if it were, the limitation would be six years, and not eight years, as pleaded. It will be equally difficult to perceive upon what ground this claim can be treated as a matter of covenant, on the part of the executor, unless it be the bond given for faithful administration, which has been decided not to be within that clause

of the act of limitations. *Probate Court* v. *Cnandler*, 7 Vt. 111. It is not necessary to say what presumptive limitation the court might or might not be inclined to apply to a case, where the requisite time had elapsed since any of the claimants came of age. It was held in the case of *Mattocks* v. *Bellamy*, 8 Vt. 463, that no term less than twenty years, unless aided by extrinsic evidence, was sufficient to raise presumption of payment, in a case not coming within any of the statutes of limitation. That term, in the present case, had not elapsed. It is thus fully shown, that the defendant, Buell, cannot be exonerated, on any statutory or presumptive limitation.

3. The decree of this court in the year 1818, that this legacy, with others, should be paid to the parents of the legatees, being minors, is relied upon by defendants as being a sufficient defence to the present bill. That decree provided for the payment to the parents, under certain restrictions, the most essential of which was, that the parents should give security for the faithful and full discharge of their duty, as guardians, by mortgage of real estate, and Ozias Buell was appointed trustee of the children, for the purpose of receiving that security. Some of the parents of infant legatees gave the required security and received the legacies. Lyman, having the funds in his own hands, neglected, and, indeed, declined to give the security. And in short, this case was not, in any sense, affected by the decree, unless the mere operation of the decree itself was to legalize that which before was illegal. We think, to give the decree of any court such an operation, would be an unheard of extension of the curing process of judicial proceedings. It is true, that what is done under the sentence, order, or decree of a court of competent jurisdiction, and in the execution thereof, is always legal, and can never be made the foundation of an action, until such sentence, order, or decree shall be reversed, and then only in the case of proceedings, not only erroneous, but irregular. It is admitted too, that this court have the appropriate jurisdiction of the person and estate of infants. The application in the present case was to the proper tribunal, and sufficiently formal.

But it is first to be considered, that this decree was only conditional. In its very terms, it was not to operate upon the property, until the parent had given security in a particular manner. Until that condition was complied with, the decree was as wholly

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozius Buell
and Others.

inoperative as if it had never been made. That condition was, from its very nature, a condition precedent. Whenever an authority is conferred upon condition that security is given for the faithful performance of the trust conferred, the giving of such security is always a condition precedent to the vesting of the authority. Such is the present case. The fact, that the funds were already in the hands of Lyman, who was the person acting both as executor and guardian, cannot vary the case. If Buell was so situated as to have become liable for the application of the funds to the payment of a legacy, he must see to it that there is a legal application made, and this could only be done by payment to the legally constituted guardian of the legatees, they being infants. A payment to the infants directly, has been held void. *Davies v. Austin,* 1 Ves. Jr. 247. *Lee v. Brown,* 4 Ves. Jr. 362. And it is equally clear that payment to the father would be void. The cases cited by counsel show that, until recently, the English courts would not permit the estate of infants, in the shape of legacies from a stranger, to go for their education, maintenance or support, before the age of majority. But such is not the present doctrine of the English Chancery. And although a court of Chancery will permit the estate of the infant to be expended for present or future maintenance, or will, in proper cases, allow for past maintenance, this must be done in such a manner, as to secure the full benefit of such legacy or estate to the infant, and a mere payment to the father is not, of itself, sufficient. And it is difficult to perceive how this conditional order of this court varies the case. If the security had been given, very probably it would not have been necessary to pay the money again to Lyman, unless the terms of the obligation of surety had reference solely to property of the infant, by him received, subsequently to the date of the obligation. At all events, such security might have been given, as to reach the funds, then in the hands of Lyman. But until such security was given, those funds could not, in any manner, be considered as appropriated by the decree of this court, or by the general operation of law, to the payment of this legacy. The argument, that because this court had designated Lyman, as a suitable person to receive those funds, after having given proper security, he might therefore lawfully receive them, without any such security being given, or, indeed, that, *ipso facto,* funds, which he had squandered long before that time, actually

came back from their "lost estate," and, *eo instanti*, operated as <span style="float:right">Chittenden,<br>January,<br>1837.</span> payment of a legacy, which, until that moment, was "*due* and *unpaid*," and this by the force of a decree, in its terms, depen-<span style="float:right">Sparhawk &<br>Others.</span> ding upon a condition precedent, which is confessedly not per-<span style="float:right">*v.*</span> formed, involves an absurdity almost as gross, as that of permit-<span style="float:right">Admr. of<br>Ozias Buell</span> ting one man to appropriate the property of another, upon the <span style="float:right">and Others.</span> ground of his having commenced an action, in which he *expects* to recover judgment and obtain execution, and thereby perfect his title to the property, which he thus unceremoniously proposes to put to his own use, in advance of his title.

It is also contended, that the accounting before the probate court is so far an adjudication upon the subject matter of this claim, as to preclude a recovery here upon the part of the orators.

It is contended, indeed, on the part of the orators, that this decree of the probate court was not upon any such notice as the statute required. But it was held by this court, in the case of *Corliss* v. *Corliss*, 8 Vt. Rep. 373, that in regard to decrees of the probate court, it would be presumed that they were had upon proper notice and formal proceedings, although such previous proceedings did not appear of record. And in that case it was held that parol proof could not be received to show that no such notice and antecedent proceedings were had. This decree then is to be held as sufficiently formal.

It is undoubtedly true, that probate proceedings, and the adjudications of probate courts are *in rem* and bind all the world. But it is to be considered, that the judgment of no court is conclusive upon any matter, only collaterally in issue before it. The adjudication is only conclusive upon those matters *directly* passed upon by the court.

It is the constant practice, before those courts, when administrators or executors come to render their account, to credit them the amount of claims, returned by commissioners, as so much money paid by them. This is done without any inquiry whether those claims have been, in fact, paid or not. If assets are found in the administrator's hands, sufficient for this purpose, he is bound to pay all debts returned by the commissioners as due ; and, being bound, it is not material to the question of accounting, whether the payment has been actually made or not. His bond is presumed to be sufficient security for that purpose. But no one ever inferred from this matter being passed to the credit of

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

the administrator, in the general account, that, therefore, the creditors of the estate were concluded from pursuing the administrator for the recovery of their debts. The adjudication was for another purpose wholly. The object of the accounting is to ascertain the assets in the hands of the executor, and the distribution of those assets. The creditors have no interest beyond the amount of assets. If it be conceded that, at all events, such assets are sufficient to pay all the debts, then they have no motive to appear before the court. If the executor should be allowed by the court for paying debts or legacies, not due, and thus affect the *residuum*, this would undoubtedly conclude those interested in such *residuum*, and the executor would be exonerated, after paying the amount decreed to be paid to those entitled ; for this is the object of the accounting, *i. e.* to find the amount of funds in the hands of the executor ; and this matter is directly in issue, and, being adjudicated, the decree binds all interested in the question.

It is difficult to perceive why the case of a specific legacy should not come under the same rule with a debt due a creditor. If credited to the executor as so much " money paid," this, in contemplation of law, only *signifies*, that it is to be paid before the distribution of the *residuum*. For the purpose of ascertaining whether the debt or legacy is to be paid at all, the adjudication may be conclusive, but the executor must see to it that the money is paid, and he must keep his own vouchers for that fact, and cannot rely upon his decree of quietus, except for what it was intended, as pointing out the manner of disposing of the estate, and it concludes nothing, as to the fact, whether the estate has been thus disposed of. To extend the operation of probate decrees beyond this, and make them conclusive upon every collateral matter, recited, or in any way affected, by the proceedings, would be dangerous, and, indeed, subversive of all known and established principles upon the subject of adjudications, operating *in rem*, and not *in personam*.

As to the receipts relied upon by the defendants, as a discharge of the shares of the two eldest girls, it will be perceived, that they amount to an admission of payment, when the fact, as found, by this court, was otherwise. The girls, being more than eighteen years of age, could not by our law be treated as infants. At common law, males and females were upon equal footing, in this respect. But that section of the bill of rights in

Chittenden,
January,
1837.

Sparhawk
and Others
v.
Admr. of
Ozias Buell
and Others.

the Constitution of this State, which declares involuntary servitude illegal, and not allowable after males arrive at the age of twenty-one, and females at the age of eighteen years, has always been considered as fixing the age of majority of females at eighteen years. And after so long a time of silent acquiescence, on the part of the people, and of virtual judicial construction by all the courts of the State, before whom it has ever become important to determine the question, we should not feel at liberty, now, to treat the question as open to discussion. Such construction of that section was contemporaneous with the adoption of the constitution, and expressive of the sense of its framers, and, as we think, for very sufficient reasons.

We are not satisfied from the evidence that any fraud was intended, or was, indeed, practised upon those legatees. The testimony of Mrs. Lyman is laid out of the case, for the reason, that we think it did *tend* to charge her husband, by showing those receipts fraudulently obtained, and, if so, they could not avail the defendant Buell, and thus a decree might go against him. But if the receipt was permitted to operate as a defence for Buell, no decree can pass against the other defendants, although the bill has, as against them, been taken as confessed. For it has long been settled, that if one of two or more joint debtors, made defendants, suffer default, and the others go to trial and a verdict pass in their favor, judgment must be arrested as to the defendant defaulted. And if the testimony of the wife tend, only collaterally, to affect the interest of the husband, it cannot be used.

These receipts, then, not being under seal, cannot operate as a technical release, by way of estoppel. They only operate as an admission in writing, which is not different from an admission made without writing. It is testimony tending to show payment. It is like a promissory note, *prima facie*, upon good consideration, but not like a bond or other sealed instrument, conclusive. It may be shown, that a promissory note, or any other witten contract, purporting to be upon sufficient consideration, was, in fact, given without any consideration. This is true of the receipts. A receipt, even for a less sum, expressed to be in full of a debt, is usually *prima facie* evidence of payment of the debt. But this, like all other evidence, resting in parol, is liable to be contradicted. In this case, it being shown that the receipts were given without any consideration, they can have

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

no effect. If, by being given, they had operated to put Buell off his guard, and thus placed him in a different situation from what he otherwise would have been in, the case might have merited a different consideration. But that is not pretended.

Having disposed of all the different grounds of defence relied upon by the defendants, it would hardly seem necessary to enter into any discussion of the obligation assumed by the joint bond, given by all the executors with surety, for the faithful performance of all duties, including, of course, the payment of the legacies. The statute in force, at the time this bond was executed, did not prescribe the form of the condition of executors' bonds. The form of the condition of Administrators' bonds was given. And executors are required to give bonds to " return a true and perfect inventory of the estate, and to render an account of his or her proceedings thereon, in the same manner administrators are, by law, obliged to do."

This latter clause, in grammatical construction, would more naturally seem to qualifiy the act of rendering " an account," than the giving of bonds. But it would be a very frivolous construction of this statute, to limit that claim to the rendering of the account, and to hold that the rendering of the account had reference only to the statement of the executors' proceedings, and, whether true or false, no matter. We think there is no doubt the legislature intended that an executor's bond should be co-extensive, in obligation, with that of an administrator. There would seem to be no good reason why they should not be held to give the same security, that is required of administrators ; which, indeed, is now required in terms. At common law, the authority was considered as conferred by the appointment of the testator. It was treated as a personal, fiduciary trust, and the executor was not holden to give any further security for the performance of the duty, than was implied from his selection. But the sound basis of such a rule is not very obvious to common sense, and in practice, it is believed no such rule ever obtained in Vermont. The forms in use, under the statute in force, at the time this bond was given, show, if nothing more, what was then the practical construction of the statute. Those forms are all similar to the bond in this case, imposing the same liability in the case of executors and administrators. The idea of requiring a bond for the mere purpose of securing the return of a correct inventory, and the rendering of a formal statement of the account

of the executor, without requiring any security for faithful administration, would seem to be preposterous. And the provision, that, when the executors were residuary legatees, they might give bonds "to pay the debts and specific legacies only," would seem to favor this construction.

We think, in short, from the terms of the statute, it was intended that executors should, as they did in this case, give bonds for faithful administration, which will include the payment of debts and legacies ; and that this bond, not extending the obligation beyond that, is valid and may be enforced at law. *Hall, Judge,* v. *Cushing et al.* 9 Pick. 395.

Being a joint bond it will bind each executor for all the acts of his co-executor. *Brazier* v. *Clark,* 5 Pick. 96. 1 Swift's Digest, 449.

And as the sureties would only be ultimately liable, in case of the avoidance of all the principals, and the other executors being confessedly insolvent, or out of the State, the burden would eventually be made to fall upon the estate of Buell.

And, if Buell is ultimately liable for the amount of whatever decree shall pass in this case against Lyman, and Lyman is confessedly insolvent, and Buell is so far directly interested in the subject matter as to be properly joined in the bill, and the subject is properly cognizable in this court, we should not dismiss Buell and pass the decree against Lyman alone, when the amount was eventually to come from the estate of Buell. But, having jurisdiction of the case for the purpose of inquiry and partial relief, we should feel bound to retain it and pass the decree against Buell, even if it were for the *devastavit* of Lyman, on the ground that the obligation assumed, in giving a joint bond, extended even to the case of the *devastavit* of a co-executor. *Rathbone* v. *Warren,* 10 Johns. R. 587.

So that, in either view of the case, we think the orators are entitled to a decree for the amount of the legacy and interest, up to the time of the accounting before the probate court. The interest up to that time is allowed on the ground that the executors had credited the interest, as having received it.

Since that time, and up to the bringing of the bill or demand of the legacy, (and the bringing of the bill is the first demand shown,) the right to claim interest will depend upon the rule of law applicable to the case. After the bringing of the bill, the orators are of course entitled to interest, as for the detention of the money.

Chittenden,
January,
1837.

Sparhawk &
Others
v.
Admr. of
Ozias Buell
and Others.

Trustees of this character, who have the charge of funds of the *cestui que trust*, are liable for interest in two events. First, Where they have actually received interest; and, secondly, where they might have realized interest. In the case of a pecuniary legacy, due to a person of full age, it would, doubtless, be the duty of the executor, in a reasonable time—say one year —to pay over the money, after demand, and perhaps, even without demand, or he will be liable for interest.

It seems to be well settled, that in the case of adults, entitled to a pecuniary legacy, especially when the executor is compelled to pay the same out of his own funds, he is not chargeable with interest until after demand, or until he has an opportunity to pay the same, when the legacy is not payable at a specified time. In the case of infants the rule is otherwise, and the executor has generally been held liable for interest. But when it is recollected that the defendant, in this case, (Buell) is compelled to pay the legacy out of his own funds, for permitting Lyman, indeed, to waste the funds of the testator, and for paying over funds to the residuary legatees, which should have been first appropriated to the payment of the specific legacies, under a n istake of the law, possibly; and when it is recollected that since the legatees, most of them, came of age, the claim has been permitted to lie by, for almost ten years, we do not think the claim for interest rests upon any very substantial grounds. It has been held that a legacy, payable to an infant, on his coming of age, is not to draw interest, notwithstanding the executor has had funds for the payment of the legacy. *Tyrrel* v. *Tyrrel*, 4 Vesey, Jr. 1.

We hold in this case, that the executor could not legally pay the legacies, until the legatees came of full age, or guardians were legally appointed, and to still hold the executor, Buell, who is compelled to pay the legacy out of his own funds, liable for interest, while he could not be permitted to pay the money, or while the legatees were lying by, after they came of full age, and when there is no pretence of his having received interest, is inconsistent with the just and reasonable duty of executors. We think the doctrine of the case cited from 3 Mumford, 198, *Cavendish* v. *Heming*, more in accordance with just principles. It was there held that, even in the case of infant legatees, the executor was not to be charged with interest until after guardians were appointed, and had notice of such appointment.

To hold the contrary doctrine would be to compel him to assume Chittenden, January, 1837. the burden and risk of having guardians appointed, or leave the money at his own risk, and thus assume the responsibility of a Sparhawk & Others. v. faithful guardianship of all the infant legatees, which must greatly enhance the extent of faithful administration, and in a manner, Admr. of Ozias Buell and Others. which would hardly be considered as coming within the obligation of the bond. The orators, then, are entitled to the amount credited to the executors in their account, and interest on that sum from the date of the bill. 1 Mumf. 150, *Fitzgerald* v. *Jones*.

This disposes of the case, except the questions in relation to the operation of the petition for rehearing and the decease of one of the orators, there being no bill of revivor.

In the English chancery, and in New York, it is held that, on petitions for rehearing, the case is open for the party petitioning, only upon the points relied upon as a ground of rehearing, and rehearings there are usually upon some specific point upon the certificate of two counsellors, that there should be a rehearing, and then the entire case is open to the oposite party. But here, rehearings are only granted by order of two chancellors, and usually upon the merits and the entire merits of the case, and the whole case is considered as open to both parties. And so it will be perceived the present case has been treated.

In relation to the decease of one of the orators, it will depend upon the nature of the interest of the legatees. If the interest is joint, and in the nature of a joint tenancy, the *jus accrescendi* attaches, and the whole legacy may be recovered by the surviving orators, without the necessity of a bill of revivor. And such we think is the nature of this bequest. It was not a separate interest in each child in an aliquot portion of the gross sum, which was intended by the testator but a joint interest in the whole. The survivors are enti-tled to recover the whole. *Gilbert, Executor*, v. *Richards*, 7 Vt. Rep. 202.

PHELPS, J. dissenting. The importance of this case, and the novelty of many questions involved in it, justify, in my judgment, the expression of my individual opinion. Whatever respect I may entertain for the judgment and opinion of my brethren, my own sense of duty will not permit me to acquiesce in a decision, which I am convinced is not sustained by sound legal principle, and which, in my opinion, does manifest injustice in the case in which it is pronounced.

The outline of the case under consideration, I understand to be this :

Wm. C. Harrington died many years since, having made and published his last will and testament, in which he bequeathed a special legacy to the plaintiffs, under the denomination of the children of Phineas Lyman, and similar legacies to the children of certain others of his relatives ; and constituted his two sons, Wm. and George, his residuary legatees. By the same will, he appointed the said Phineas Lyman and the defendant's intestate, Ozias Buell, with others, the executors of his will. The trust was assumed by the persons designated in the will. Lyman possessed himself of a portion of the assets, which were not only sufficient to pay the particular legacies, but left a considerable surplus for the residuary legatees. The debts of the testator having been paid, the executors remained, for some years, trustees for the legatees, who were minors, and having no legal guardians, the legacies could not be paid to them by the executors. In this state of things, the executors petitioned the court of Chancery to be relieved of their trust, and that court decreed payment of the particular legacies to the parents of the particular legatees, upon the parents giving bonds for the performance of their trust, in a manner prescribed by the court. This condition was complied with by all the parents, except Lyman, the father of the orators, and the several legacies paid to them by Buell from the assets in his hands. Lyman claimed the right of retaining the legacy to his children, out of the assets in his hands, and did so retain. A settlement was then had, in the probate court, of the executors' account, on which occasion the executors rendered and presented, in the first instance, separate accounts, but by direction of the probate court, they were afterwards consolidated. In these accounts Lyman claimed a credit for the amount of the legacy to his children, which was allowed, and Buell claimed a similar credit for the several particular legacies paid by him, in pursuance of the decree in Chancery, which was also allowed. The residuary legatees then preferred their claim for the surplus, which was duly paid to them by Buell, and their claim was satisfied. At this period, nothing remained in the hands of either executor, except the amount of the orators' legacy, which was in the hands of Lyman, he having retained the amount out of the assets in his hands. Up to this time Lyman was solvent, and in good credit. Buell, having accounted

for all the assets in his hands, was desirous of having the business so adjusted, as to secure him from all future claims, and *probably*, at his suggestion, two of the orators, on arriving at full age, executed to him their receipts for their portion of the legacy. It is not supposed that any thing was in fact paid to them on that occasion, but the object of those receipts was to sanction the appropriation already made of the fund in Lyman's hands, and relieve Buell from all further claims. Subsequently to all this, Lyman became insolvent, and Buell died. The estate of Buell was represented insolvent, and regular proceedings were had under a commission of insolvency, the time for the presentation of claims expired, and the commissioners made their report in due season. The claim of the orators was never presented nor allowed, but this bill is now preferred against the representative of Buell, to obtain payment of the claims, upon the alleged ground of the insolvency of Lyman, and a supposed devastavit or breach of trust in him. This is an outline of the case. I do not deem it necessary to go further into the details of the transaction here. Certain particulars, which may be important, as bearing upon certain points in the case, will be mentioned in their order.

Chittenden, January, 1837.

Sparhawk & Others v. Admr. of Ozias Buell and Others.

The main question, and that upon which, in my judgment, the case turns, is, whether Buell can be made responsible for the default of Lyman. It is admitted that Buell has accounted for every farthing which came to his hands, and it is further admitted that Lyman has retained the amount of this legacy, for which he has never accounted; that all other claims upon the estate of Harrington have been satisfied, but, it is alleged that this legacy has never been paid, and that Lyman is utterly irresponsible. Upon these premises, there can be no possible ground of recovery against Buell, or his representative, unless it be a supposed liability resting upon him for the default of his co-executor.

It is obvious, then, that there is no peculiar equity in the orators' case. The claim against Buell is in the nature of a claim against a surety, and rests upon the footing of strict legal right.

It is conceded by the orators, and, if it were not, it requires no argument at this day to establish the position, that the trust of co-executors is not necessarily joint. At common law, their liability is several. Each is liable for his own acts alone. This is too manifestly the current of all authority to admit of debate.

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

There are cases, in which an executor has been held liable for the default of his co-executor, but, in all these cases, the party charged has been accessory to the default, or chargeable with some delinquency in regard to his trust, which either induced or afforded opportunity for the default complained of. The mere fact, that one executor possesses himself of assets, and his co-executor did not prevent it, and possess himself of the same funds, is not enough; but the party to be charged must be guilty of some breach of trust, negligence, or disregard of duty, before he can be made liable.

It is insisted, " that if one executor possesses assets and passes them into the hands of a co-executor, who wastes them, both are liable." This doctrine requires some qualification. It is doubtless true, that if one executor possess assets applicable directly to the purposes of the trust, and passes them into the hands of a co-executor, without good reason or sufficient purpose, it is a breach of trust in not making the application himself, and he is liable. But cases may and do exist, where such a transfer of assest is necessary and proper, and where the proceeding is not only consistent with a conscientious discharge of duty, but in pursuance of the original design of the party creating the trust. I shall endeavor to shew presently, that this is such a case. So it is said, " that if one assents to a disposition of assets by the other, which proves a mis-application, both are liable." There is the best of all possible reasons for this, viz. that both are equally guilty. So, " if two join in a receipt for money, which comes to the hands of one who wastes it, both are liable." It is undoubtedly true, that when they choose to act together, in such a manner as to render the proceeding a joint act, it is the act of both, and both are responsible for it. But it remains to be ascertained, how, and in what manner, the transaction in question can be made a joint proceeding, and the default in question, the default of both.

Before proceeding to apply the general rule to the present case, it will be well to notice another position, viz. that the executors, having executed a joint bond, are of course liable for the acts of each other. To sustain this position, Swift's Dig. p. 449, is cited, and also *Brazier* v. *Clark*, 5 Pick. 96. Swift says merely that they may be made liable *in an action on the bond*, and the case in Pickering goes no further. So far as the joint undertaking by bond goes, they are unquestionably joint-

Chittenden,
January,
1837.

Sparhawk
and Others
v.
Admr. of
Ozias Buell
and Others.

ly responsible, and so would be a surety who executes the bond with them, although not a party to the trust. By executing a joint bond, they become sureties for each other; but it by no means follows, that in the character of trustees merely, and responsible as such in a court of Chancery, the nature of their obligation is changed. Had a remedy been sought on the bond and in another court, the question would have been different. But in this court, we have no concern with the bond, or the remedy upon it. The parties are before us as trustees; and the question is, what are their liabilities as such. Admitting that they are jointly liable on the bond, it by no means follows, that they are jointly responsible here. It is every day's practice in Chancery, to discriminate between persons jointly responsible at law. The remedy at law, on the bond, is no longer available. It is extinguished by the proceedings in relation to Buell's estate,—by the closing of the commission, and the peremptory bar of the statute. No mortal supposes that this court can revive that remedy, as against the surety, who may have signed the bond with these executors, nor can we revive it against any body. We may, indeed, enforce a trust, but the character of that trust is not to be varied by the existence of a collateral security, which once was, but is now no longer available.

My own opinion is, that we are to treat this claim precisely as if no bond had ever been given. But if I err in this, it is because the obligation of the bond and the duties of the trust are so blended and amalgamated, as to form an entire and indivisible duty, receiving its character from the impress of both. If this be so, and the claim of the orators is to be regarded as one and the same, whether entertained here or elsewhere, it will be difficult, I apprehend, to make out, that this identical claim is extinguished by the commission of insolvency upon Buell's estate, and, at the same time, still subsists with all its characteristics and incidents, to be en orced hereafter. Indeed it is impossible, in my opinion, to entertain this controversy, in this court, as arising out of the bond. It is only by disregarding the bond, and treating it as a case of trust merely, that this court can take cognizance of it. But of this more hereafter. I return to the question, whether Buell can be made liable upon common law principles.

There is no pretence, in my view, for treating the default as

Chittenden,
January,
1837

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.
the joint act of these parties, or as growing out of their joint
acts.  To be sure they were co-executors and both acted as
executors, but if this renders each responsible for the default of
the other, what becomes of the rule, which is conceded by the
counsel ?   The inventory may have been signed by both,—pro-
bably was ; but this does not prove that both had actual custody
of the assets.  It is very common for one executor or adminis-
trator to take the sole charge of the assets, the other being asso-
ciated for the purpose of advice, &c.  It is also a common
practice to divide the duties of administration, as was done in
this case—Buell being the principal executor, and taking charge
of the property in possession, and Lyman, being an attorney,
taking charge of the books, and closing the professional business
of the testator.  A large amount of property came into the pos-
session of Buell, in the disposition and management of which
Lyman had no agency.  On the other hand, a large amount of
debts and demands came into the hands of Lyman for collection,
in which collection Buell seems to have taken no part.  No
actual interference of his is shewn : nor indeed, that he was in
any wise accessory to the proceedings of Lyman, except that
he permitted the demands to go into his hands, or, as is insisted,
placed them there.  The effect of this will be presently consider-
ed.   The case, therefore, presents an instance of several execu-
tors dividing their duties, each taking upon himself differ-
ent branches of the administration or execution of the will.
This is a very common case—a distribution of duties, evidently
contemplated by the testator himself, and one, with reference to
which the several executors were selected.  If the rule, that
co-executors are not responsible for the acts of each other, does
not apply here, it is difficult to imagine a case, which would ap-
ply, and if, notwithstanding such a distribution, they are to be
considered as acting jointly throughout, and in all particulars,
simply because they make the arrangement in the outset, the
rule itself becomes a matter of idle speculation, of no practical
use or application.   The cases cited are all at war with such a
notion, and with the idea, that, although the executors act sepa-
rately in fact, yet their proceedings are constructively joint.
They shew abundantly, that, in order to make an executor liable
for the default of his co-executor, he must be implicated in the
particular default, either by concurring in it directly, or by some
neglect of duty which led to it.

It is said, also, that the accounting in the probate court was joint and the settlement joint. This is not true in point of fact. It appears that the executors presented several accounts, which, by direction of the probate court, were consolidated. Nothing is clearer, than that this proceeding, which was purely arbitrary in the court, could not affect the question, whether these parties had previously acted separately or jointly. Had they presented a joint account in the outset, it would afford evidence, so far as it went, of an intent to assume a joint responsibility ; but having acted separately, and presented separate accounts, the act of that court, in directing the form of that adjustment, could neither afford evidence as to their previous acts, nor conclude them as to their liabilities. But admitting, for argument sake, that the parties had acted jointly up to this period, yet another view of the subject may be taken equally satisfactory. There had then been no delinquency. Lyman was then solvent and in good credit, and fully as able, for aught which appears to us, to meet the claim, as Buell himself. He claimed a credit for the amount of the legacy due the plaintiffs as his children, by way of accounting for the funds in his hands; which credit was allowed. This, although no satisfaction of the legacy, was, at least, an appropriation of the fund in his hands for that purpose. Buell had then paid the other particular legacies, and proceeded immediately to pay the balance in his hands to the residuary legatees. He had thus accounted for every thing in his hands. Lyman had also accounted for every thing in his hands as executor, and all that remained to be done was, either to pay over the legacy in question, or give the security required by the court of chancery, as father of the legatees. In this state of things, the other particular legatees, the creditors, and residuary legatees, being satisfied, no person had any claim upon the fund in Lyman's hands except the plaintiffs. He held the fund, not as a fund for the general purposes of the original trust, but as a trustee for his children alone. Buell had in his hands no fund of any kind appertaining to the trust ; and there had been, thus far, no breach of trust, with which either could be charged. At this period the trust was changed; Lyman became, instead of a trustee for the purposes of the will generally, a trustee for his children alone. He became in fact sole trustee ; and if Buell were trustee at all, he was so nominally only. From this time forward, Lyman acted as sole trustee. Buell neither acted in

Chittenden,
January,
1837.

Sparhawk
and Others
v.
Admr. of
Ozias Buell
and Others.
fact, nor professed to act. Some years afterwards, Lyman became insolvent, and the plaintiffs, it is said, have never been paid their legacy. Now admitting that these parties acted jointly, up to the time of the settlement in the probate court, yet, subsequently, Lyman acted alone, and Buell is not responsible for his defaults.

I use this argument here, merely to show that Buell can not be made liable, upon the ground that he acted jointly with Lyman, at the time the breach of trust was committed. It will be seen, however, that this consideration of the severance of the joint trust, if it ever was joint, and the aspect which the trust then assumed, have a material bearing upon other points in the case.

I ought, perhaps, to add here, that, in this state of the business, Buell, having ceased to act, was precisely in the condition of a trustee, who had resigned his trust. Will it be insisted, that a trustee, who has retired, can be made responsible for the subsequent default of the acting trustee, upon the ground that they *act jointly?* I think not : but if he is to be made liable in such a case, it must be upon the ground, either that he is responsible, of course, for the acts of his co-trustee, or is in some way implicated in the breach of trust complained of. The first is not pretended, and the other part of the alternative I shall now consider.

If Buell be liable at all, as having been in any way accessory to the breach of trust, it must be either, because he suffered the fund to go into the hands of Lyman in the outset, or because he did not withdraw it afterwards. I make this the basis of my argument, because I see no other ground which can be taken. The question whether he should not have paid the particular legacy out of the funds in his hands, and turned the residuary legatees round to the fund in Lyman's hands, I consider not important to the main question of his liability ; for if he can be made liable at all for the funds in Lyman's hands, he must be responsible to one or the other, and it is immaterial to which.

It is insisted that Buell is responsible on the first ground, because he placed the funds in Lyman's hands ; and it is said that " if one executor possesses assets and passes them into the hands of a co-executor, who wastes them, both are liable."

I have already remarked upon this position, as requiring qualification. It does not hold where there is good reason for the

transfer. Thus, where an executor, residing in the country, had Chittenden, January, 1837. funds which he was desirous of paying over to a creditor in town, and remitted them to a co-executor in town for that pur- Sparhawk & Others v. Admr. of Ozias Buell and Others. pose, who wasted them, it was held that he was not responsible. The reason of this is obvious. The fund must be remitted in some way, and to entrust it to a co-executor was as proper as to entrust it to a stranger. There was good reason for the remittance, and the executor was excused. But there is another qualification worthy of notice. The assets must be such, strictly speaking.

With these qualifications, let us apply the rule to this case. A part of the property in Lyman's hands was obtained by him without the concurrence of Buell: a part, it is said, was placed in his hands by Buell. Admitting this to be true, although the evidence hardly sustains the assertion, yet that property consisted of demands in favor of the testator against sundry individuals, which were placed in his (Lyman's) hands for collection. These demands, although in one sense assets, were not such in another. They were assets when converted into cash, and not before. Now suppose Buell to have had these demands in his possession, and to have placed them in the hands of an attorney for collection, and the avails had been lost, without any default of his. Would he be responsible? Most clearly not. If then, he was at liberty to employ an attorney for this purpose, —and that he was, will not be denied—was he not at liberty to employ the man designated by his testator for that purpose? the man in whom the testator had reposed the same confidence as in himself?

For what purpose was Lyman named an executor, if he was to have no agency in executing the will? And how could Buell be required to exclude him from all participation in the trust, when the testator himself had appointed him co-executor with Buell, with equal and co-ordinate powers? It is to be borne in mind that the testator was himself an attorney, with an extensive practice and great property. He left, as we may well suppose, many things unsettled, and must have been aware that the agency of an attorney would be necessary in the adjustment of his affairs. It indeed was necessary. Lyman was also an attorney, a relative and partner in professional business with the testator. He was made by his relative and partner one of his executors, doubtless as a favor, and with a view to the benefit

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

of professional employment in the business. Buell finding demands which it was necessary to collect, employs his co-executor for that purpose. How then it can be made out, that it is waste, culpable negligence, a devastavit, in Buell to commit this duty to the very man designated by the testator for that purpose, I confess is beyond my comprehension to conceive. Had Lyman been insolvent, or, in any sense, of doubtful responsibility, the case would have been different. But it is fully in evidence, that he was in good credit, and of apparent, if not real, responsibility, until long after Buell had closed his trust, and for years after the fund for the payment of this legacy was left in his hands, upon the final adjustment. Or, had Buell received the money upon these demands and paid that money to Lyman, instead of the legatees, I should hold him responsible upon the authority of the cases cited; unless, indeed, some justification had been shown. But I can see no analogy between such a case and the present; nor between this case and the cases cited, where a trustee seeks to avoid responsibility, by paying money to his co-trustee, instead of the person entitled to it. In this instance, it was not Buell's duty to deliver these demands to the legatees, but to cause them to be collected. He did so, and, in my opinion, selected the proper agent. On the other hand, the money arising out of these demands never came into his possession, but came, in the first instance, into the hands of Lyman. And so far as Buell contributed to this result, he did so in strict performance of his duty, and, as I believe, in pursuance of the intent of his testator. I see no reason, therefore, for charging him on this ground.

As to calling the money out of Lyman's hands, I know of no process, either at law, or in equity, by which Buell could effect it. Lyman, as trustee, was as much entitled to retain the money as Buell. Had Lyman been irresponsible, it would have furnished good grounds for the interference of the court of chancery. But the fact was otherwise, and there was as little reason to displace him as Buell.

The only course, which could be taken, was taken. A petition was brought by the trustees to be relieved of their trust. Upon this application a decree passed, directing payment of the legacies to the several parents of the infant legatees, upon their giving bonds to account with the legatees, upon their becoming of age.

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

This was the course adopted by Buell to close his trust, and the proper, if not the only course, which the case admitted of.

Let us see then what was the effect of this decree ; whether Buell was guilty of any default in this part of the transaction, and whether the effect was to charge, or discharge him.

It is to be borne in mind, that Lyman was one of the executors, and father of these legatees, that he had in his hands the amount of the legacy in question, which he professed to retain for these orators.   In this state of things, Lyman and Buell brought their petition to be discharged of their trust as executors, and the court decreed payment of the several legacies to the parents of the several legatees, of whom Lyman was one, requiring security from the parents, by way of bond.   In pursuance of this decree, Buell pays the other legacies, taking the security required, and pays the balance of assets in his hands to the residuary legatees.   Lyman accounts for the amount in his hands, deducting the legacy, but did not give the security required.

The result of all this was, in my opinion, that Buell's trust was determined, and all liability on his part extinguished.

The object and intent of this decree was to put an end to the trust and responsibility of the executors, and this was its necessary legal consequence.   The parents were substituted as trustees to the executors, and Lyman held the fund, not as executor, but as parent.   Payment from Lyman to Lyman was not contemplated.   To suppose such a ceremony to have been intended by the court is ridiculous, and a libel upon the court. But in this, as in all other like cases, the law made the transfer. It was like decreeing a dividend to a creditor of an insolvent estate, who is also administrator.   The moment sufficient assets come to his hands, the law makes the application, and the debt is *ipso facto* paid.   If this be doubted, let us examine the operation of this decree more in detail, both in regard to the fund itself, and those who held it.   The argument, that these legatees could resort to Buell for their legacy, assumes that the other particular legatees could do the same.   He was bound to pay them, upon their furnishing the security required, which he did.   He paid them and their claim was satisfied.   The residuary legatees were entitled to the *residuum* without giving security, and they received it.   Thus Buell had paid over every farthing in his hands—his trust was fully executed, and, so far

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

as he was concerned, the decree was fully complied with. Lyman still held the amount of this legacy, but that amount was no longer held for the general purposes of the original trust. The creditors, and the other legatees, were all satisfied—they had no claim to, nor interest in, the fund in question. The only persons interested in it, were these plaintiffs. Lyman held it in trust for them and them only. Moreover, the money was in the hands of the individual entitled to receive it, under the decree. The whole trust fund had gone to its proper destination. Lyman then held it in the same manner precisely, as the parents of the other legatees held their portions, and, in my estimation, a claim on the part of the other legatees for the default of their parents, in wasting the fund, would be as well founded against Buell, as this claim. How was it as respects Buell? Admitting that the trust was originally joint, yet Buell, so far as he was concerned, had fully executed his trust. He held not a cent in trust for any body. Lyman was, therefore, sole trustee from that time forward. There had been as yet no defalcation. Lyman was then fully responsible, and was so for years afterwards. How then can Buell be made responsible for his after default? This view of the subject furnishes a satisfactory answer to all the positions taken by the orators. Assuming that they were jointly responsible, as executors, by reason of their joint bond to the probate court, and that they acted jointly as executors, yet, when their duty, as executors, was discharged, there was an end of their joint responsibility. When a new and different trust arose, where Lyman was sole trustee, and these plaintiffs alone were *cestui que trust,* a trust not appertaining to their office of executor, but created by the decree in chancery, it is clear there could be no further accountability on the part of Buell for the preformance of duties, not within the scope of his executorship, and appertaining to a trust, to which he was not a party. So if Buell be responsible for the due application of the funds committed to his co-executor, yet that responsibility is satisfied when these funds reach their proper legal destination, are disposed of as the provisions of the will require, and are no longer a part of the original trust.

The only answer, which can be given to this argument, is, that Lyman did not furnish the security required by the decree. It is said that giving that security was a condition precedent to the payment of the money, and, therefore, the decree did not take

effect, nor will the law make the application, until that condition is performed.

So far, indeed, as respects the other legatees, whose parents were not executors, this is true. The decree contemplated a payment to them, which payment might be withheld until the condition was complied with. But as to Lyman, the case was different. The money was already in his hands, and it was so understood by the court. The language of the decree, so far as he was concerned, was, "keep the money as trustee for your children, but furnish us a bond for the faithful execution of that trust." From the nature of the case, the giving the bond could not be a condition precedent to the reception of the money, for the money was received before the bond was required. The true construction of that decree is, that it made Lyman a trustee for his children, and required of him a security in that character. The idea, that the security was a condition precedent in his case, is an absurdity. When, therefore, the original trust was broken up, and the fund distributed, the law made the application; leaving it to the court and those interested, to enforce the new trust against Lyman, either by exacting the security or otherwise. This necessarily resulted from the other proceedings under the decree. Buell having executed his trust, and the common fund being distributed, the money in Lyman's hands became, of course, the money of the orators, and he a trustee for them alone.

Another view may be taken of this point, which, I apprehend, is decisive of the whole case. The sole ground of complaint in the case is, that Lyman did not give the security required. Had this been done, however worthless it might have proved in the end, it is not pretended that Buell would be liable. Indeed, had this been done, it is conceded that the decree in Chancery would have afforded Buell a full and perfect defence in this case. Every thing in relation to the execution of the will, and the final distribution of the estate, down to the execution of the decree in chancery, was performed agreeably to the requirements of the will, and the terms of that decree, except the omission on the part of Lyman to give the security.

Now how can Buell be made responsible for that omission. How could he compel Lyman to give the security? It is said he should not have paid over the money, until the security was given. This argument is nonsensical. The money was in Ly-

Chittenden,
January,
1837.

Sparhawk &
Others.
*v.*
Admr. of
Ozias Buell
and Others.

man's hands, before the security was required. It was no part of his duty, as executor, to give the security. It was a duty imposed upon him by the decree, as trustee of his children. What had Buell, as executor, to do with this? He could not force the money out of Lyman's hands, nor compel him to give the security; and, admitting his liability in all respects, for the act of his co-executor, yet this was no part of that co-executor's duty.

The truth is, the requiring the security, as a condition precedent, was nugatory; as a subsequent duty, it was foreign to Lyman's obligation as executor, and, *a fortiori*, to that of Buell.

Besides, there was a full and adequate remedy against Lyman, which these orators might have enforced in this court, by compelling him either to furnish the security, or surrender the fund. They might have displaced him as trustee, and it was their own fault if they neglected this remedy until he became insolvent.

But it is said, that Buell should have provided for this legacy, notwithstanding the fund in Lyman's hands. Had Lyman been insolvent or in doubtful circumstances, before the payments by Buell, there would be some plausibility in this reasoning. But the fact was otherwise. It was then as much the duty of Lyman to guard against the insolvency of Buell, as the reverse. If they were jointly liable to the legatees, this argument is unimportant; but, if each was responsible for his own acts only, then the fact that Lyman had retained a fund for this purpose, was a sufficient reason for Buell's paying the other legatees.

It is argued however, that, although he was at liberty to pay the particular legacies, yet he was not justified in paying the residuum to the residuary legatees, as the former had a preference.

I do not perceive the force of this argument. Had the whole assets been paid to the residuary legatees, leaving nothing for the particular legatees, I admit he would have been liable. But the amount of assets had been ascertained, they were sufficient to pay the particular legacies, and a specific sum was left for the residuary legatees. The latter were as fully entitled to their specific portion as the former. I admit that if there be no more than sufficient to pay particular legacies, they must be preferred, but when there is a surplus, and the precise portion of each is ascertained, I can see no ground for a preference. Indeed, in this state of things, I do not understand what is meant by it.

There may be a preference where there is a deficiency of assets, but where there is no such deficiency, there can be none.

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

Indeed I see not how Buell could resist the claim, either of the particular or general legatees. Suppose the other particular legatees claim their legacies of him, would it be any defence against them that there was a fund in Lyman's hands, set apart for the payment of the legacy in question? It would be so, indeed, if, in case of a solvent estate, it would be a good reason for not paying one debt, that there were assets sufficient to pay others also. Nor can I see how he could resist the claim of the residuary legatees. The assets being liquidated, there could, as I have already observed, be no distinction between the claimants. If this needs further illustration, let us suppose there were assets to the amount of ten thousand dollars, or in other words, cash in the hands of the executors to that amount. There were, I think, four particular legacies of one thousand dollars each, and upon this supposition, there would be six thousand dollars for the residuary legatees. They are therefore entitled to the money in the ratio of six to four. Now by what logic can it be made out that one class is not entitled to their six thousand, as fully, absolutely, and without condition or preference, as the others are to their four thousand.

Lyman and Buell both could retain against the residuary legatees, only the single amount of this legacy. It is very clear, then, that, so long as the money was in Lyman's hands, set apart to pay this legacy, Buell could not resist the claim of the residuary legatees. Indeed there was an obvious propriety at that time, in Lyman's retaining in behalf of his own children.

There is nothing, then, in the proceedings of Buell, in paying over to the other legatees the assets in his hands, which should render him responsible to these orators; because he did simply what the necessity of the case required, and what a court of Chancery would have compelled him to do, had he refused.

I have thus far endeavored to shew, that Buell was never responsible for this defalcation of Lyman. A brief recapitulation of the argument may not be improper. In the outset, I assume, what indeed is not contested, that one executor is not, as a matter of law, liable for a devastavit of his co-executor. And it follows from this, as a necessary corollary, that one is not of course liable for all claims, whether by creditors or lega-

Chittenden,
January,
1837.

Sparhawk
and Others
v.
Admr. of
Ozias Buell
and Others.

tees, where there is a deficiency of assets through the delinquency of his co-executor.

I insist that Buell, in this case, is not liable for the default of Lyman, on the ground of their having executed a joint bond to the probate court.

First, because this would not vary the character of the trust, but they could be made jointly responsible only through the medium of the bond, or by suit upon it.

And secondly, because the original trust of the executors was executed and determined, before the supposed devastavit occurred, the only default consisting in Lyman's not giving the security required by the court of Chancery, as parent and guardian of the orators, without which this bill would not be sustained a moment; and this was evidently no part of his duty as executor, and not within the scope of the bond.

Further, Buell is not responsible upon the ground that they acted jointly, because he is not implicated in the particular default complained of, and it is not enough to render co-executors responsible for each other in all respects, that they have acted together in some respects; and, because, if they did act jointly as executors, yet there was no default in Lyman's retaining the amount of this legacy, as one or the other must be the depository of the funds, and it was as much the duty of Lyman to call the fund out of Buell's hands, as Buell's duty to call it out of Lyman's hands. And when Buell closed his trust, by paying over the funds in his hands to those legally entitled, there had been no default, no delinquency, and if Lyman afterwards squandered the fund held by him, as trustee for his children, it was an act not within the scope of their proceedings as executors, and Buell is not liable.

I also hold that Buell is not made responsible by reason of passing funds in his hands into the hands of Lyman, in such manner and under such circumstances as render him accessory to the *devastavit* by Lyman. First, because there is no satisfactory evidence in the case, that any thing passed from Buell to Lyman; and secondly, because, if any thing passed, it consisted of demands which were not assets until converted into cash, and which he might have placed in the hands of another attorney for collection, without making himself liable for a *devastavit*, and which, of course, he might lawfully deliver for that purpose to his co-executor, an attorney by profession, and one designated

by the testator himself. Although I admit, that one executor Chittenden, January, 1837. can not evade responsibility by a transfer of funds to his colleague, yet he makes himself liable only, where the act is un- Sparhawk & Others. v. Admr. of Ozias Buell and Others. necessary, not called for, or improper. I maintain that it is not his duty to exclude his fellow from his trust, and that he is at liberty to permit him to act in collecting the assets, especially when there is satisfactory evidence that in so doing he pursues the intent of his testator. In short, my opinion is, that Buell can not be made liable on that ground, for the default of Lyman for this act, unless the act itself is culpable, or decidedly wrong. Had it been his duty to deliver these specific demands to the legatees, I should admit his liability; but as they would pay neither debts nor legacies until collected, it was his duty to see them collected, and I can not conceive how it should be deemed a violation of duty to select his colleague for that duty. In my apprehension, whatever may have been the responsibility of the executors, as such, yet Buell was fully and completely discharged of his trust by the decree of the court of chancery, and the proceedings under it, and the settlement in the probate court. By that decree the several legacies were directed to be paid to the parents of the legatees, they giving bonds, &c. This was done in all cases but this, and Buell had executed his trust by paying the last farthing in his hands, in strict accordance with the terms of that decree. Nothing remained of the testator's estate but the fund in Lyman's hands, set apart and appropriated to the payment of this legacy. Had Lyman given the security required, no mortal could have projected this bill. But he neglected it; and on this ground, and this alone, this suit rests. It is admitted on all hands, that, if the security had been given, the decree would have operated to discharge Buell effectually and forever.

Now I hold that the decree had precisely the same effect, so far as Buell was concerned, as if the security had been given. This fund was understood at the time to be in Lyman's hands, retained on account of this legacy. It was expected and designed that he should keep it. It was expected and designed that the other legacies should be paid out of the fund in Buell's hands. This was done. Now was there not a full and complete distribution of the assets? and was Lyman after this accountable to any human being, but his children? The old trust was extinguished and a new one created, necessarily, and as the

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.

inevitable consequence. The decree had taken effect fully and absolutely; except indeed, that Lyman had not given the security. But this was a thing to be enforced against him as trustee for his children, and with which Buell had no concern. The only answer to this is, that the decree was conditional; and it is said the trust was not shifted, because the condition precedent was not complied with. However this might be in the other cases, as to Lyman it could not be so. No payment by Buell to him was contemplated. The money was already in his hands, and was to remain there. The security was therefore not a condition precedent, but a condition subsequent,—a substantial requirement, to be enforced against him thereafter. As it was not a condition precedent, and could not be from the nature of the case, it could not prevent the trust's shifting. Buell had no means of enforcing this part of the decree, as he had in other cases. Whether we consider Lyman as holding as executor or as trustee for his children, seems immaterial, as Buell, if not responsible of course for the acts of his co-executor, can not be liable for Lyman's subsequent default, in retaining the money without giving security. Buell was under a necessity to pay the funds in his hands to the other legatees by force of the decree, and this furnishes an additional reason why it should protect him.

I now proceed to the question in the case growing out of provisions of the act, relating to the probate of wills and the settlement of estates.

Buell deceased long prior to the bringing of this bill, his estate was represented insolvent, regular proceedings were had under a commission of insolvency, the time for presentation of claims had expired, and the orators' claim was not presented.

In my opinion, it is barred. On this point, I assume, that whatever is strictly speaking a debt, *debitum in presenti,* must be duly presented, or it is barred. I also assume, that in all cases where Courts of Law and Courts of Chancery have concurrent jurisdiction, a bar of this description, if available at law, is also available in chancery; or, to speak more guardedly, when a Court of Chancery can do no more than decree payment of a sum of money which a Court of Law would adjudge, a bar of this kind is equally available in both courts.

It is to be borne in mind also, that this statute is of a different character from ordinary statutes of limitation *inter vivos.* The

latter bars the *remedy*, the former the *claim*. The one may be varied, the other not. The latter is local, regulated by the *lex fori*, the former is peremptory and govered by the *lex loci*. We held in *Hunt* v. *Fay et al.* after repeated argument, that the limitation in the statute of New Hampshire to the presentation of claims against an intestate estate, the statute having taken effect in that State, where the creditor and intestate both resided, was a peremptory bar to the claim, when presented in this State to commissioners appointed under an auxiliary administration. This distinction is important, as it disposes of some cases, where one remedy has been enforced after another had been taken away. Those cases are where the statute of limitation has run *inter vivos*, but the provision of the probate act, as it bars the claim and not the remedy simply, bars of course all remedies.

With these preliminary remarks, let us inquire whether the claim in question, if it ever had legal existence, is not barred by the statute above mentioned.

In the first place, if the bond gives a remedy, as it clearly does, for every default coming within the scope of the executors' duty, then the claim was susceptible of proof before commissioners. The default was committed long before Buell's decease, and Lyman was long before that period utterly insolvent. If therefore all claim within the provision of the bond, and all claim, which might be enforced by means of the bond, is barred absolutely, it is difficult to perceive what is left of the orators' claim. If it be admitted that this claim does not come within the scope of the bond, as not within the executors' duty, and not within the condition to discharge faithfully that duty, then there is an end of another ground, upon which the case rests. And if it be conceded, as it must be, in order to evade the effect of the statute in question, that the act complained of is not a breach of Lyman's bond, nor of his official duty, then it follows that it is a breach of duty in him *as trustee for his children*, and the case is disposed of upon the ground I have already taken.

It appears to me, that Buell's liability for the acts of Lyman is fully as extensive upon the bond, by which he undertakes specially for his acts, as it is when resting upon the mere relation of a co-executor. Indeed, it is more so. At common law, it is admitted, that executors are not liable for the acts of each other;

Chittenden,
January,
1837.

Sparhawk &
Others
*v.*
Admr. of
Ozias Buell
and Others

Chittenden,
January,
1837.

Sparhawk &
Others.
v.
Admr. of
Ozias Buell
and Others.
but this bond is intended to' cover all the acts of each in that character, and therefore; if they become obligated jointly, that obligation for each other is co-extensive with their duties.    The orators, therefore, are in' this dilemma ; they must either bring their case within this statute, or place it beyond the pale of official duty, and attach it to á trust with which Buell had no connection.

It will not be pretended; I trust; that a court of chancery is not bound by this statute, or that it can decree damages for a breach of this bond, where a court of law would be precluded.

But put the bond out of the case, and it is; in my opinion, equally clear that this claim is barred by the statute.

Something has been said as to maintaing a suit at law for a legacy.    Whether this can be done in this State, is not a question of much importance, as in our mode of settling estates, the question is not likely to arise.    I see no great difficulty in maintaining such a suit in any case, where an action can be sustained against an executur, for the debt of his testator.    If there be any objection to it, it is because a court of law would not go into an examination of the condition of the estate, to determine whether there are assets for the payment of legacies ; but when the estate is represented insolvent, no such embarrassment can arise.

But be it a legacy, or be it what it may, there was certainly no difficulty, in this case, in presenting the claim, and having an adjudication upon it, before commissioners.    It will be remembered, that before the decease of Buell, the estate of Harrington had been fully settled, all debts had been paid, and the surplus paid to the residuary legatees.    A settlement had been had in the probate court; in which the executors had taken a credit in their final account, for this legacy, as paid, according to the usual practice of that court, which allows the executor for all ascertained charges upon the assets, whether in fact paid or not, leaving it to the claimant to enforce payment from the executor, and no further action of that court was to be expected in the premises.

Under these' circumstances, this claim was no longer a legacy, depending upon the state of the assets; but it was a debt absolute and unqualified, ascertained of record, to which the claimants were absolutely entitled, and which the executors, or one of them, at least, were absolutely bound to pay ; not merely as executors, but as individuals, having received the money for that

Chittenden,
January,
1837.

Sparhawk
and Others
v.
Admr. of
Ozias Buell
and Others.

purpose, and having been already credited for the payment. It be-came, in this state of things, a private personal debt, no longer a claim upon the estate of the deceased, but a debt due from the liv-ing individual, to be paid from his own pocket; a thing with which an administrator, *de bonis non*, would have no concern. It was the same thing as if a third person had been entrusted with the orators' receipts for the amount, and had received it of the execu-tor. An action of debt would unquestionably lie for it, or an action of assumpsit, unless the remedy by assumpsit was merged in a higher security. It may be compared to the case of a pension agent, who, having received the receipt of the pensioner, and had the same allowed to his credit, by his supe-rior, objects to paying the money, because, as a public agent, he is not sueable for a pension. I assume, for the purpose of this argument, the original liability of Buell, although, in my opinion, he was not liable at the time of his decease.

The fallacy, of the plaintiffs' argument consists in treating this as a legacy, when it was no longer such. As a legacy, it had been satisfied and paid, the money was no longer a part of the estate of Harrington, that estate, if I may use the expression, had paid it, and nothing remained but that Buell and Lyman, who had received the money from the estate, should pass it to the true owners. I can not conceive any difficulty in enforcing a claim under such circumstances, nor in its being allowed by commissioners. I do not understand how Buell's administrator could resist the claim, in this state of things, upon the ground that it originated in a legacy. No matter how the money came into the hands of the executors. It was there, and they are no longer accountable to the probate court, but to the orators alone. It was a proper claim for the consideration of commissioners, and, if not presented to them, is barred.

It has been suggested, that there is evidence tending to show a waiver, on the part of the administrator of Buell, of the pro-tection of the statute. It is unnecessary to spend time upon this point, as it is well understood that the statute is not intend-ed for the benefit of the administrator, but of the estate, and it is not competent for the administrator to dispense with it.

The only remaining ground, upon which it is attempted to evade this statute, is, that the case presents a trust cognizable only in equity, not within the powers of the commissioners, and, of course, not barred by the statute. This position assumes,

Chittenden, January, 1837.

Sparhawk & Others. v. Admr. of Ozias Buell and Others.

what, indeed, is not to be denied, that there is a wide distinction between a mere trust, cognizable only in chancery, and a debt, which may be enforced at law. A mere statement of this distinction is sufficient to show on which side of the line this case falls. I have already endeavored to show that, although there was in this case, originally, a legacy given by the will of Harrington to these orators, yet, by the allowance of that legacy, by the probate court, and the credit given to the executors, in their final account, the nature of the claim was changed, and it became an absolute debt; and, as such, was proveable under the commission. The same reasoning will apply to it, viewed as a trust. If we denominate Buell a trustee for the legatees, still that trust was determined when the proceedings just mentioned took place in the probate court, and he became, therefore, a simple debtor for the amount.

In my apprehension, it is altogether fallacious, to treat this case as a case of trust, cognizable only in chancery. Buell, as executor of Harrington, was trustee for these orators in the same sense only, as all executors and administrators are trustees for creditors, heirs, or legatees. Call it a trust, or call it what you please, it is a subject falling within the exclusive jurisdiction of the probate court. The administrator or executor is the mere officer of that court, deriving his authority from that source, although the executor is nominated by will, exercising his functions under the superintendance, order, and ultimate jurisdiction of that court. In entertaining this subject, we invade that jurisdiction. The case before us illustrates this truth, with more force than any supposititious case. In the matter of Harrington's estate, that court established the will and allowed the legacy under it. Will it be pretended that this decree of that court, in a matter within its jurisdiction, is not conclusive? or that we have power either to set aside the will, or annul that legacy? Further, the Probate Court, upon the final accounting, not only ascertained that there were assets for the payment, but actually decreed the payment, and allowed the amount, as paid, in the executors' account. Whether it was, in fact, paid, or to be paid thereafter, that court would not inquire; no more than it inquires whether debts allowed by commissioners are, in fact, paid or not, when it credits the administrator for the amount. The reason of this is, that in all these cases, the claimant has adequate remedy in the ordinary common law courts. Now if

we have jurisdiction over the subject, we may disallow the leg- Chittenden, January, 1837.
acy altogether, or decree that Buell shall not be holden to pay
it. If we do this, we must necessarily overhaul the account- Sparhawk & Others. v. Admr. of Ozias Buell and Others.
ing; for if Buell is not compellable to pay the amount, he should
not be allowed for the payment, but the balance in his hands
must go to the residuary legatees. Here, then, we have over-
turned the whole proceeding in the probate court, and settled
the estate of Harrington in a manner altogether at variance with
the determination of the court, which, it is admitted, on all hands,
has exclusive jurisdiction over the subject.

But if we cannot do all this, nor, indeed, any of this, what is
there left of our jurisdiction? Nothing indeed; for the case admits
of nothing else, but to enforce the decree of the probate court,
*because* it is the decree of that court. And here, a new and
extensive field is opened for the exercise of chancery jurisdic-
tion. The probate court decrees the payment of debts, as al-
lowed by commissioners, and legacies, if any; or payment of an
ascertained and liquidated balance, in the hands of an administra-
tor, to the heirs; and all these parties come into this court, to en-
force payment of a specified sum, adjudged to be due them,
through the medium of a decree of this court, to be in its turn
enforced by execution to be issued here, or by process of con-
tempt. I am not aware that this court ever assumes jurisdic-
tion, as a mere court for the collection of debts, or to aid in the
enforcement of decrees of another tribunal, unless under pecu-
liar circumstances, affording, of themselves, grounds for equita-
ble inteference.

If this subject requires further illustration, let us suppose that
the probate court had rejected the will, and thus annulled the
legacy. Would it be competent for us to establish either the
one or the other? It will not be pretended.

If then this court can neither establish the legacy, where the
probate court has disallowed it, nor disallow it where that court
has allowed it, what becomes of the position that this is a case
of trust cognizable only in Chancery? The truth is, the sub-
ject is not within the jurisdiction of this court at all, unless we
interfere for the mere purpose of enforcing the decree of anoth-
er tribunal.

But this is not all. The matter came before the probate
court again upon the decease of Buell, in the settlement of his
estate. That estate was represented insolvent, and regular

Chittenden,
January,
1837.

Sparhawk &
Others,
v.
Admr of
Ozias Buell
and Others.

proceedings were had under a commission of insolvency.   This claim was not presented.   Here, again, the subject fell within the jurisdiction of that court, and it was competent for that court to issue its commission of insolvency.   This claim was liquidated and adjusted, and was proveable under the commission, beyond all controversy.   But it is said it was a trust, and, therefore, was not proper for the consideration of commissioners.   So is every case of administration or executorship a trust. But it does not follow, that, upon the decease of the executor or administrator, the subject of his official trust, or the allowance of claims against his estate is transferred to this court. If he have not so far executed his trust as to become personally liable, an administrator *de bonis non* is appointed by the probate court, where jurisdiction over the subject remains.   If he have so far executed his trust as to become personally holden, then indeed, no administrator *de bonis non* can be appointed, but his obligation becomes a debt to be enforced in the mode prescribed by the statute.   In this case, the account of the executors was finally adjusted.   The whole estate of Harrington had been accounted for. The appointment of an administrator *de bonis non* would have been idle. It was a case with which such an administrator would have no concern.   Upon the settlement of the executors' account, a sum of money was in their hands, directed to be paid to these orators.   The original trust was adjusted and closed, and this debt was left to be enforced by the orators, and should have been proved under the commission.   Nay, it is not pretended that Buell had a cent in his hands, but the case is put now upon the ground of his liability, for the default of his co-trustee, Lyman.. If, then, he was liable on this ground only, by what perversion. of names is it to be made out, that a liability of this kind, for the default of another, is to escape the operation of the statute, and the proceedings of the probate court, under the denomination of a trust.

There is still another view of the subject, worthy of consideration.   I am unable to conceive what we have to do with the defendant, the administrator of Buell, as trustee.   It is to be borne in mind, that this suit was not instituted, until after the decease of Buell, and was then brought against his son and administrator, Frederick Buell.   He also is deceased, and the bill now stands against Marsh, administrator *de bonis non* of Ozias Buell.

Now it is clear that the original defendant in this suit was not,

by virtue of his administration, an executor of Harrington, be- cause the statute is explicit on this point. He was not, there- fore, a trustee upon the ground of succeeding to the original trust. In the next place, it is conceded that Ozias Buell had not a cent of Harrington's estate in his hands, at the time of his decease. F. Buell, therefore, did not receive any portion of the trust fund, and was not made trustee in that way. I admit that if trust property comes to the hands of an administrator, he may be treated as trustee, *quoad* that property, and it may be called out of his hands by the *cestui que trust, because it is not a part of his intestate's estate.* But here there is nothing of that kind. How, then, is F. Buell made a trustee ? In no oth- er way, clearly, than that he is administrator of O. Buell, (who was once trustee, if you please.) What is the condition of the trust ? Simply this. The fund, intended for the payment of this legacy, got into the hands of the co-trustee, Lyman, under such circumstances, that Buell was responsible for it, and Lyman has squandered it. The claim is now made against Buell's ad- ministrator, upon *that ground, and for a specific sum of money,* which he owed the orators, having, at the time of his decease, no condition or trust attached to it, except that it was his duty to cause it to be paid to them long before his decease. Now if the administrator can be made a trustee as to this claim, he is a trustee as to any claim against O. Buell's estate ; and we may, with equal propriety, entertain a claim in behalf of any other cre- ditor of that estate. If F. Buell is to be made liable, (or Marsh, who succeeded him,) he is to be made so, as administrator, sim- ply, and that liability is to be regulated by the proceedings of the probate court ; and if one creditor may overleap the stat- ute and the proceeding under the commission, another may do so. My objection is, that in sustaining this bill, we, in the first place, intrude upon the exclusive province of the probate court, and secondly, we nullify the statute, which requires all such claims to be presented to commissioners, and bars them, if not presented. I see no pretence for treating the administrator of Buell as trustee, except that he is administrator, a ground which exists in every case ; and if we are to assume upon ourselves the settlement of intestate estates, and oust the jurisdiction of the probate court, I know not where we shall end. I confess I dislike the precedent. If we allow claims against an estate, which are barred by the statute, upon the ground of a trust in

Chittenden,
January,
1837.

Sparhawk &
Others
*v.*
Admr. of
Ozias Buell
and Others.

the administrator, the jurisdiction of the probate court seems to be useless.   And if we attempt to exercise concurrent jurisdic tion, that court proceeding with a commission of insolvency, and we by Bill in Chancery, the usual consequences of a clashing antagonist jurisdiction must follow.

The idea that Buell was once trustee will not sustain us.   If there were a  subsisting trust  at the time of  his  decease, a new trustee  should be  appointed to  supply his place.   If he have squandered the trust  property,  or  others  have done it with his concurrence, or if a  debt  has grown  out of a settlement of his account, as trustee, it is to be enforced, like every other debt, in the mode pointed out by law.

As to his  administrator,  I can  conceive of no ground,  upon which we  can deal with him,  unless he  has received the trust fund,  or some portion of it.   If his intestate  is indebted in any sum, for which the estate is  holden, it is competent for the probate court to require a presentation to commissioners, and if this is not done, it is barred, peremptorily, by the  statute.

To prevent misapprehension, I here repeat, that I use the words ‘ trust’  and ‘ trustee,’  in their strict sense.   I am aware, that in the common parlance of the profession, these words are used in a general, and often loose, sense.   But I here use them as denominating that sort of trust,  which falls within the  jurisdiction of a court of Chancery, exclusively, and not  within the scope of ordinary legal remedy ;  and  my object has been to prove, that this case does not  present such an instance of trust, as is not susceptible of being  brought before the  commissioners of an estate, represented insolvent.   And the  position, which I take, is, that this claim was not only proper for the action of the commissioners,  but that  it should have  been presented to them, and that, not having been presented, it is barred by the statute.

There is another point  in the case, a subordinate one indeed, as it concerns two  only of the orators,  upon which I will say a few words.

It appears  that two of these  orators, after becoming of age, executed receipts to Buell for their portion of the legacy.   It is not supposed that any thing was paid to them by him upon that occasion, but the  receipts  must have been  intended to sanction the previous  proceeding of Lyman,  in retaining  the amount in his hands, and to discharge Buell.

It is to be  remembered  that these persons were of full age,

when these papers were executed. They were not voidable on the score of infancy, therefore, but only for some imposition or mal-practice in obtaining them.

To prove this, the testimony of Mrs. Lyman is put into the case; but, in my opinion, it falls far short of competent proof of the fact. In the first place, she is most clearly incompetent to testify, as her husband is party to the bill, and so identified with Buell and his liability, that he could not be made a witness. In the second place, her testimony is altogether too general. She says, merely, that the orators did not know what they signed, but gives no particulars, by which her means of knowledge can be tested. They might have been aware of the import of these papers, and still her testimony may have been very honestly given. But it is so highly improbable, that persons of full age would execute such an instrument, without knowing its import, that something very satisfactory is required to prove the contrary.

Considering, then, that no fraudulent or improper practice was resorted to in obtaining the receipts, I have only to say, that the execution of them not only sanctioned the previous proceedings, but also placed Buell in a situation, in which he must necessarily yield to the claim of the residuary legatees. It affords also another ground for the reasoning already presented in this opinion, by which I have endeavored to shew, that, long before Lyman became insolvent, the original trust was at an end, and he became sole trustee for his children. Every other legacy had been paid, the estate fully distributed, except that the money in question remained in Lyman's hands, for the benefit of the orators, and two of them, being of full age, executed to Buell receipts for their portion. Now how it can be considered that Buell's original liability, as executor, continued, or that he was still joint trustee with Lyman, and answerable to these two, who had thus discharged him, is beyond my comprehension. This act, in my opinion, made Lyman, so far as the two children were concerned, a sole trustee.

Some other points have been discussed in the argument, which I deem it unnecessary to notice. I have remarked upon such only as were, in the view, which I have taken of the case, material; and I am admonished by the length to which these remarks have been extended, of the propriety of closing them.

In conclusion, I may add, that this is not an attempt to call out of

Buell's hands money. which he has ever received, or which was ever in his possession or control, as money. The nearest ap-

proach to it is, that sundry demands were once in his hands, which he passed over·to Lyman for collection. But it is an attempt to recover from his estate money, which another has squandered, upon the ground of a supposed liability for the acts of that other. In addition to this, I cannot resist the suspicion, that much of this money had been expended for the benefit of the orators; for it seems they were well provided for in the wane of their father's fortunes. How much has been bestowed upon their maintenance and education, it is perhaps impossible to ascertain. But however this may be, the claim of the plaintiffs is not to be favored. It is one *stricti juris*, and, in that aspect, is not, in my opinion, sustained. I should dismiss their bill.